UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| LISA CARRELL, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:24-CV-00080 |
| | ) | Judge Waverly D. Crenshaw, Jr. |
| BUC-EE'S TENNESSEE, LLC AND | ) | Magistrate Judge Luke A. Evans |
| BUC-EE'S, LTD., | ) | JURY DEMAND |
|     Defendants. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Lisa Carrell, by and through counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.01 of the Local Rules of Court, submits this Response to Defendants' Motion for Summary Judgment.

## INTRODUCTION

Defendants Buc-ee's Tennessee, LLC and Buc-ee's, Ltd. have moved for summary judgment on Plaintiff Lisa Carrell's premises liability claim, arguing that Ms. Carrell is more at fault for her injuries than the Defendants. In essence, Defendants argue that Ms. Carrell acted unreasonably in failing to see the wheel stop in the parking lot where she fell and injured herself. Facts offered by Ms. Carrell demonstrate that she took reasonable care when exiting the store and approaching her car. They also establish that Buc-ee's acknowledged that customers frequently traveled the same path Ms. Carrell walked when exiting the store and that they knew of more than 250 falls on wheel stops in the eighteen months prior to Ms. Carrell's fall. Drawing all inferences from the facts in Ms. Carrell's favor, reasonable minds could differ on the question of whether her fault was equal to or greater than that of the defendants, and, as such, summary judgment should be denied.

Defendants have also move for a partial summary judgment on Ms. Carrell's claim for punitive damages. This argument relies on Tenn. Code Ann. § 29-39-104(e) to absolve them of potential liability for punitive damages for complying with certain regulations related to the design of handicapped accessible parking spaces. Defendants, however, point to compliance with regulations that do not actually apply to this plaintiff or the circumstances of this case. As such, Defendants cannot establish by a preponderance of the evidence that Tenn. Code Ann. § 29-39-104(e) protects them as a matter of law from the jury deciding the issue of punitive damages.

## **FACTUAL BACKGROUND**

### I.     **Plaintiff Lisa Carrell and Her Fall at the Crossville Buc-ee's Store**

Plaintiff Lisa Carrell grew up in Mt. Juliet, Tennessee and now lives in Lebanon. (Carrell dep. 9:11-25). Ms. Carrell is married and works full-time. (Id., 15:11-16; 23:1-24:9).

On December 2, 2023, Ms. Carrell traveled with her family for a day-trip to Cherokee Caverns in Knoxville. (Id., 66:25-67:16). Ms. Carrell went with her son, daughter-in-law, two granddaughters, and one of her granddaughter's friends. (Id., 74:17-75:4). Her son had borrowed his mother-in-law's large Chevy SUV to make the drive. (Id., 68:2-12). On the way to Knoxville in the morning, Ms. Carrell's party stopped at the Buc-ee's store in Crossville located at 2045 Genesis Rd. Crossville, Tennessee, not to get gas, but to go into the store to shop. (Id., 67:2-4; 68:13-19).

This morning trip to the Crossville Buc-ee's store was uneventful. Ms. Carrell's son parked his car in the parking lot. (Id., 68:15-19). Ms. Carrell entered the store, purchased some Christmas gifts and maybe a snack, and then went back to the car. (Id., 69:18-72:20). She does not recall seeing the wheel stops that would cause to fall later that same day. (Id., 69:10-12).

2

After their visit to Cherokee Caverns, Ms. Carrell and her family got in the car to return home to Lebanon. (Id., 74:4-11). Ms. Carrell arrived at the Buc-ee's store around 5:30 PM. (Ex. 12 to Carrell Dep.). Her son pulled the SUV up to a gas pump to fill up the vehicle. (Carrell Dep., 75:25-76:1). Ms. Carrell took her 10-year-old granddaughter into the store. (Id., 76:1-6).

When she walked to the entrance of the store, Ms. Carrell took a path to the store entrance that passed between two handicapped accessible parking spaces and that was marked with blue paint in a hatched pattern. (Id., 88:21-25). There was a car parked in the accessible spaces to the left of the blue hatched path leading to the store entrance. (Carrell dep., 150:6-157:20; Ex. 19 to Carrell dep., screenshot at 05:35:42). In the two times that day that Ms. Carrell approached the store entrance, she had not noticed any hazard or danger in her path – no pot holes, ice, or any other hazard. (Carrell dep., 90:2-8).

Ms. Carrell made a purchase in the store and exited the store to return to the SUV at the gas pump. (Id., 76:6-9). When she exited the store, the sky was dark, but the parking lot was lit up. (Id., 76:19-20). Ms. Carrell does not remember if it was raining at that moment that she walked out of the store, but it was wet and drizzly. (Id., 76:21-23).

When they walked out the front door, Ms. Carrell looked to the right in the direction of the SUV to see where the car was parked. (Id., 76:11-14). She was also paying attention for oncoming traffic. (Id. 86:12-87:1; 89:11-14). She and her granddaughter stepped into the blue hatched pathway. (Id., 86:13-21). Ms. Carrell was to the right of her granddaughter. (Id., 86:18-20). The accessible space to Ms. Carrell's right was vacant. (Id., 91:14-15).

A surveillance video recording of Ms. Carrell's fall show that right after she exited the store, she used her right hand to push her glasses up the bridge of her nose. (Carrell dep., 153:10-17; Ex. 19 to Carrell dep., screenshot at 05:38:36). She then looked forward for oncoming traffic

3

and looked in the direction of the SUV parked at the gas pumps. (Id., 86:12-87:1; 89:11-14). When she saw where her car was, Ms. Carrell shifted a little to her right away from the blue hatched path and into the vacant handicapped accessible parking spot to her right to walk in the direction of where the SUV was parked. (Id., 87:2-87; 89:1-6). Walking through the vacant accessible space to her right was the shortest route to get to the vehicle. (Id., 94:7-8).

When she drifted into the vacant handicapped accessible space, Ms. Carrell's right foot caught the corner of a wheel stop located at the end of a vacant handicap parking space. (Id., 76:24-77:5; 89:1-6; 154:1-6). Ms. Carrell fell forward, tripping on the wheel stop. (Id., 77:1-19). Ms. Carrell testified that she had not been looking down at her feet because she had not perceived any danger in that area when she previously entered the store. (Id., 89:21-90:8; 143:7-17). Moreover, she was trying to protect her grandchild from oncoming traffic. (Id., 143:12-17). When she fell, she severely injured her hand. (Id., 77:5-78:2).

## II.     Defendants' Knowledge of the Trip-and-Fall Risk Presented by the Wheel Stops

Defendants suggest in their briefing that it was incumbent upon Ms. Carrell to walk to and from the store entrance only in the "crosswalk," that is, the pathway created by the blue paint in a hatched pattern around the handicapped accessible spaces. (Defendants' Memorandum, p. 11). To Ms. Carrell, it was not even evident that this pathway was a "crosswalk." (Carrell dep., 86:13-18; 87:6-14). There were no signs in the Buc-ee's parking lot marking the path as a crosswalk or otherwise directing customers to walk in this path (Carrell dep., 87:9-14; 144:17-20; Matthews dep., 45:7-10; Harness dep., 54:10-12, 17-24; Laios dep., 92:25-93:5; Fitzpatrick dep., 78:15-17). Ms. Carrell thought the blue, hatch-patterned paint on the parking lot pavement was there to keep a car from parking in that area because doing so would block the store entrance. (Carrell dep., 86:13-18; 87:6-14).

4

The Buc-ee's Travel Centers located outside the state of Texas are a uniform design. (Sebastian dep., 38:24-39:1). They all have essentially the same arrangement of handicapped parking spaces located at the entrances and exits to the stores. (Id., 39:2-12). They all have wheel stops in the same location in the handicapped parking spaces and they all have ramps that lead to the door entrance. (Id., 39:2-12).

For their part, the Defendants specifically knew of numerous trip and fall incidents over wheel stops, at Buc-ee's Travel Centers outside the State of Texas generally and at the Crossville Buc-ee's Travel Center specifically. From May 19, 2022 to December 2, 2023, the date of Ms. Carrell's fall, there were 196 reported falls caused by wheel stops at Buc-ee's stores outside the State of Texas with the same design as the Crossville store. (Justilian dep., 93:6-11; Stammer Declaration, ¶ 16). Moreover, in the same time period, there were 60 reported falls caused by wheel stops just at the Crossville Buc-ee's store. (Justilian dep., 82:14-18; Stammer Declaration, ¶ 16). From the reported incidents, Buc-ee's employees became aware of the fact that customers simply "were not seeing" the wheel stops and were routinely tripping over them. (McGeorge dep., 42:3-11, Laios dep., 76:19-77:4).

Employees at the Crossville store testified that they could not think of any other single object that caused as many injuries as wheel stops. (McGeorge dep., 22:4-10; Laios dep., 83:12-24). Indeed, store managers, in coordination with the Buc-ee's legal department, added reflective red and white tape to the wheel stops in an effort to make them more visible. (McGeorge dep. 39:2-40:25; Harness dep., 38:22-40:22; Fitzpatrick dep., 37:13-38:5; 43:17-24; 45:4-14). When the Crossville store opened, the wheel stops were blue. (McGeorge dep., 39:19-23). Reflective tape was added later. (McGeorge dep., 39:24-40:4). Even then, customers continued to routinely

trip over the wheel stops. (McGeorge dep. 43:18-22; Laios dep., 76:6-9; Justilian dep., 100:4-9; Fitzpatrick dep., 71:22-24).

Dale Fitzpatrick, Health and Safety Manager for all retail stores was hired by Buc-ee's in 2020. (Fitzpatrick dep., 20:19-23). He testified the decision to begin to apply red and white tape began before his tenure, at a Buc-ee's in Alabama, opened prior to 2020. (Id., 37:9-12). The general manager there reached out to legal to ask to apply the red and white tape. (Id., 41:7-14). The tape was added to Crossville due to customers tripping and falling. (Id., 37:4-5).

Buc-ee's employees, moreover, knew that customers were free to walk anywhere in the parking lot and did not always use the crosswalk. (Harness dep., 54:13-24; Laios dep., 93:6-15; Justilian dep., 82:14-18; Stammer Declaration, ¶ 16). As Ms. Carrell described the Buc-ee's parking lot, "[t]he situation at Buc-ee's is everybody walks everywhere…If you just go and sit in the parking lot and watch, they don't walk in crosswalks." (Carrell dep., 144:5-14). In particular, they knew that customers walked through vacant handicapped accessible parking spaces when entering and exiting the store. (Matthews dep., 44:20-22; 45:3-10; Harness dep., 54:13-19; 95:7-9; Laios dep., 93:6-15). Indeed, if a more direct route to walk in or out of the store involves walking through a vacant handicapped accessible parking spot, people will do that instead of using the crosswalk. (Carrell dep. 144:13-14; Matthews dep., 44:34-45:2; Fitzpatrick dep., 77:13-78:6).

As acknowledged by then-Crossville store General Manager Wesley Harness, there are a number of known distractions in the parking lot, including items for sale, crowds of people, constant car traffic, and having to look after children. (Harness dep., 93:19-95:5; McConnell dep., 11:16-12:14). And, yet, there apparently was never any consideration of removing the wheel stops. (McGeorge dep. 44:1-10; Laios 78:6-19; Fitzpatrick dep., 73:16-20).

6

### III.    The Wheel Stops Are Not Required.

Buc-ee's is not required to use wheel stops at the end of the handicapped accessible spaces. Transportation engineer Robert E. Stammer, Jr., Ph.D., P.E., has reviewed this case. (Stammer Declaration, ¶¶ 1, 2). He notes that the design of the Crossville Buc-ee's store was required to comply with the 2012 International Building Code, and the 2010 ADA *Standards for Accessible Design* ("ADA Standards"). (Id., ¶ 3). ADA Standard 502.7 requires that parking spaces and access aisles be designed so that cars and vans, when parked, do not obstruct the required clear width of adjacent accessible routes. (Id., ¶ 5). The ADA Standards do not mandate or require a specific design to comply with ADA Standard 502.7. (Id., ¶ 6). The ADA Standards do not require a wheel stop in the accessible parking spaces at the Buc-ee store in Crossville, Tennessee. (Id., ¶ 4). At the Crossville store, the bollard in the accessible parking space prevented vehicle overhangs from reducing the required clear width of the accessible route as required by the ADA Standard 502.7. (Id., ¶ 7). Thus, the bollard alone would satisfy the requirements of ADA Standard 502.7. (Id.).

In addition, Dr. Stammer concludes that industry standards developed by ASTM International indicate that parking lots should be designed to avoid the use of wheel stops. (Id., ¶ 8). The ASTM standards further recommend bollards as an alternative to wheel stops. (Id., ¶ 10). As such, Buc-ee's could have removed the wheel stops in the accessible parking spaces at the Crossville store and still be compliant with the 2010 ADA Standards because the bollards alone were sufficient. (Id., ¶¶ 7, 11).

When it became apparent that there a significant number of falls were occurring as a result of the wheel stops at Buc-ee's stores, removing the wheel steps and relying on bollards was a feasible, safer alternative that Buc-ee's could have employed to eliminate customer injuries over wheel stops. (Id., ¶¶ 14, 15, 16, 17, 18). Indeed, photographs from Google Maps of the exteriors

of three recently opened Buc-ee's locations, store #61, Harrison County, Mississippi (opened June 9, 2025), store #63, Brunswick, Georgia (opened July 1, 2025) and store #69 Rockingham, Virginia (opened June 30, 2025), show the same arrangement of accessible parking spaces located at the entrance/exits of the store as at the Crossville store, except that the accessible parking spaces do not have wheel stops. (Id., ¶ 20). Blue bollards with accessible parking signs in the center of the parking stalls prevent vehicle encroachment into the required clear width of adjacent accessible routes. (Id., ¶ 6).

## LEGAL ARGUMENT

### I.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Co., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993).

All facts and inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002). Courts may not resolve genuine disputes of fact in favor of the movant. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014) (vacating lower court's grant of summary judgment for "fail[ing to] adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor") (internal quotations and citations omitted). In the context of a premises liability case, "[i]f the evidence is evaluated in the light most favorable to the plaintiff and reasonable minds could not differ that her fault was equal to or

great[er] than that of the defendants, summary judgment in the defendant's favor may be granted." *Hatfield v. Circle K Stores, Inc.*, No. 1:17-cv-82-SKL, 2018 WL 11463581, * 5 (E.D. Tenn. Mar. 13, 2018) (*citing Staples v. CNL Assoc., Inc.*, 15 S.W.3d 83, 91-92 (Tenn. 2000)).

## II. Summary judgment should be denied because reasonable minds could differ as to who bears more fault for Ms. Carrell's injuries.

### A. Buc-ee's owed a legal duty to Ms. Carrell, which has not been contested by Defendants.

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a). As a diversity action, the Court applies the substantive law of the state of Tennessee to Ms. Carrell's claim. *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001). Under Tennessee law, the first element of any negligence action is to determine whether there is a duty of care owed to the plaintiff. *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998).

As acknowledged in Defendants' briefing, a landowner such as Buc-ee's Tennessee, LLC and Buc-ee's, LTD owes a duty to exercise reasonable care to maintain its parking lot in a reasonably safe condition. (Defendants' Memorandum, p. 5). A duty arises "when the degree of foreseeability of the risk and the gravity of the harm outweigh the burden that would be imposed if the defendant were required to engage in an alternative course of conduct that would have prevented the harm." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 365 (Tenn. 2008). While determining whether a duty exists involves the weighing of many factors, this issue is a question of law that the court must decide. *Id.* at 355.

In moving for summary judgment, defendants do not contest that they owed a duty to Ms. Carrell. Rather, the crux of their argument on summary judgment, is that because the wheel stop where Ms. Carell fell was open and obvious, Ms. Carrell acted unreasonably in failing to see the

9

wheel stop where she fell such that she should be held more at fault for her injuries than the Defendants.

### B. Comparative fault is a question of fact, usually not suitable for ruling on summary judgment.

Once duty is found to exist, the negligence inquiry turns to the question of comparative fault. *Coln*, 966 S.W.2d at 40. In Tennessee, "comparative fault is an affirmative defense in which an alleged tortfeasor asserts 'that a portion of the fault for the plaintiff's damages should be allocated to another tortfeasor.'" *Ellington v. Jackson Bowling & Family Fun Ctr., L.L.C.*, No. W2012-00272-COA-R3-CV, 2013 WL 614502, at *10 (Tenn. Ct. App. Feb. 19, 2013) (quoting *Banks v. Elks Club Pride of Tenn. 1102,* 301 S.W.3d 214, 220 (Tenn. 2010)). Whereas the issue of duty is a question of law, comparative fault is a question of fact. *LaRue v. 1817 Lake Inc.*, 966 S.W.2d 4236, 427 (Tenn. Ct. App. 1997). Relevant factors for considering comparative fault include but are not limited to the following:

> (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the  defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Coln*, 966 S.W.2d at 44.

Such a multi-factor, factual inquiry is "within the jury's province, which should not lightly be invaded by the trial court." *LaRue*, 966 S.W.2d at 327. Indeed, the Tennessee Court of Appeals has commented on "the infrequency of a trial court's determination of comparative fault at the summary judgment stage of the proceedings." *Lundell v. Hubbs*, No. E2019-02168-COA-R3-CV, 2020 WL 6867229, at *15 (Tenn. Ct. App. Nov. 23, 2020); *Halmon v. Lane Coll.*, No. W2019-

01224-COA-R3-CV, 2020 WL 2790455, at *6 (Tenn. Ct. App. Feb. 19, 2013) (same). One court has described a trial court's analysis of comparative fault on summary judgment like this: "[t]he task of comparing and allocating fault may be taken from the jury only when it can be determined beyond question (or alternatively, when reasonable minds cannot differ) that the plaintiff's fault is equal to or greater than the defendant's." *Henley v. Amacher*, No. M1999-02799-COA-R3-CV, 2002 WL 100402, at *6 (Tenn. Ct. App. Jan. 28, 2002).

### C. Comparative fault and the "open and obvious" rule.

The *Coln* case resolved the question of how courts should understand the operation of the "open and obvious" doctrine in the evaluation of the comparative fault of parties. The Court in *Coln* summarized its holding like this:

> That a danger to the plaintiff was "open and obvious" does not, *ipso facto,* relieve a defendant of a duty of care. Instead, the duty issue must be analyzed with regard to foreseeability and gravity of harm, and the feasibility and availability of alternative conduct that would have prevented the harm…[I]n short, if the foreseeability and gravity of harm posed from a defendant's conduct, even if "open and obvious," outweighed the burden on the defendant to engage in alternative conduct to avoid the harm, there is a duty to act with reasonable care. The circumstances of the case are then analyzed under comparative fault.

*Coln*, 966 S.W.3d at 43.

In *Coln*, the Court had consolidated two cases for review and, thus, engaged in a comparative fault analysis of two fact patterns. In the *Coln* case, the plaintiff had walked across brick pavers toward the entrance of a municipal building when she tripped on the lip of the concrete sidewalk adjacent to the brick pavers. *Id.* at 37. The Court noted that the deviation where plaintiff tripped was in an area that had to be traversed to get to City Hall, the city had actual knowledge of the deviation and although the city was aware that it could be corrected, and the city took no steps to correct the problem. *Id.* at 44. Applying the six comparative fault factors noted above, the Court

11

affirmed the trial court's allocation of 30% of fault to the plaintiff and 70% of fault to the City of Savannah. *Id.* at 44-45.

In the *Vancleave v. Markowski* portion of the case decided in the *Coln* opinion, the Court reversed summary judgment for the defendant, finding that material factual issues precluded summary judgment. *Id.* at 45-46. There was evidence showing that, although the opening in the pool deck where plaintiff fell was large, the plaintiff was walking in close proximity to the owner while talking and looking into the yard at the time she fell. *Id.* at 46. Summary judgment in favor of the defendant was vacated because factual issues existed as to "the proximity and exact distance between the plaintiff and homeowner, their actions just before the plaintiff fell into the opening, and the existence of conduct that may have distracted the plaintiff." *Id.* While the Court expressed no view on the relative fault of the parties, the Court concluded that plaintiff was "entitled to proceed with her case." *Id.*

From just the fact patterns examined in the *Coln* case and despite what Defendants suggest, summary judgment on the issue of comparative fault is not "routinely" granted, even where a harm is "open and obvious." For instance, one case cited by Defendants, *Smith v. C3 Presents, LLC*, emphasizes how the issue of comparative fault involves such a fact-specific inquiry that summary judgment is rarely appropriate. *Smith v. C3 Presents, LLC*, No. 4:23-cv-25, 2025 WL 1117427 (E.D. Tenn. April 15, 2025). In *Smith*, plaintiff was attending the annual Bonnaroo Music Festival when he tripped over a tent line and fell, breaking his elbow and shoulder. *Id.* at *1. The tent line, which was solid black in color, anchored one of the official event tents and plaintiff fell in the evening when walking between two tents on what he thought was an official festival pathway. *Id.* at 1-3.

Arguing that the plaintiff's fault exceeded 50%, the Defendant in *Smith* noted that the plaintiff admitted that he was in a hurry when he tripped and also that plaintiff's friends had seen the tent line. *Id.* at *7. The Court acknowledged that this proof was "persuasive." *Id.* The Court also noted that although the issue of comparative fault is "typically reserved for the jury," summary judgment may be appropriate on this issue in some circumstances. *Id.* Ultimately, however, the Court concluded that a jury could reasonably conclude that either party was more than 50% at fault for plaintiff's injuries and, as such, denied defendant's motion for summary judgment. *Id.*

### D. The grant of summary judgment involving a similar fact pattern against a Buc-ee's store in Georgia is wholly inapplicable to this case.

In support of their argument, Defendants cite a Georgia case where a plaintiff sued Buc-ee's Georgia, LLC in a "nearly identical" set of facts involving a trip over a wheel stop. (Defendants' Memorandum, p. 6). In that case, the federal trial court granted Buc-ee's Georgia, LLC's motion for summary judgment. *Full v. Buc-ee's Georgia, LLC*, 4:24-cv-000078-WMR, 2025 WL 3254887, *4 (N.D. Ga. May 23, 2025). Defendants note in their brief the court's observation in granting summary judgment: "Though Plaintiff did not actually observe the wheel stop, the wheel stop's location was so transparently open and obvious to Plaintiff that she should have been aware of its presence." *Full v. Buc-ee's Georgia, LLC*, 4:24-cv-000078-WMR, 2025 WL 3254887, *4 (N.D. Ga. May 23, 2025).

Defendants' one-sentence citation to the *Full* case, however, fails to acknowledge that Georgia premises liability law is substantially different from Tennessee law in how it addresses open and obvious conditions. In the *Coln* case, Tennessee adopted § 343A of the Restatement (Second) of Torts to explain how open and obvious conditions should be addressed in the context of Tennessee's comparative fault regime. *Coln*, 966 S.W.2d at 43. Georgia courts have not, however, adopted this section of the Restatement. *See* Restatement (Second) of Torts § 343A.

13

Under Georgia tort jurisprudence, a condition that is found as a matter of law to be "open and obvious" invokes Georgia's "plain view doctrine," which imputes constructive knowledge to an invitee when the invitee "confronts a hazard in plain view at a location where it is customarily found and can be expect to be." *Gutierrez v. Six Flags over Georgia II, LLP*, 887 S.E.2d 352, 355 (Ga. App. 2023). The invitee's constructive knowledge of an open and obvious condition relieves the landowner of any duty to warn the invitee or otherwise modify the condition and, as a matter of law, plaintiff cannot recover from injuries arising from the open and obvious condition. *Id.* at 541; *see also Rozy Investments, Inc. v. Bristow*, 623 S.E.2d 171, 173-75 (Ga. App. 2005).

Because of the difference between applicable law in Tennessee and Georgia, this Court should not give any weight to the fact that a Georgia federal trial court granted summary judgment to a Georgia Buc-ee's entity on facts similar to those presented here. The *Full* case is wholly inapplicable to this case.

### E. Analysis of the Comparative Fault of Ms. Carrell and Defendants.

#### 1. General Principles of Comparative Fault

Tennessee law of comparative fault provides that "an individual has a duty to take reasonable care for his or her own safety." *Goumas v. Mayse*, No. 2013-01555-COA-R3-CV, 2014 WL 1713195, at *8 (Tenn. Ct. App. Apr. 29, 2014). Defendants contend that Ms. Carrell failed to take reasonable care for her own safety and that her fault for her own injury exceeds that of Buc-ee's. Defendants' analysis of the comparative fault question, however, fails to address several factors relevant to the Court's inquiry on this issue.

In premises liability cases, the premises owner has "the duty to exercise reasonable care under the circumstances to prevent injury to persons lawfully on the premises." *Dobson v. State*, 23 S.W.3d 324, 330 (Tenn. Ct. App. 1999). Such a duty is based on the understanding that an

14

owner has superior knowledge of any perilous condition that may exist on the property. *Id.* To assess whether a risk to the plaintiff is unreasonable so as to give rise to a duty to act with due care, courts must employ a balancing approach. *West v. E. Tenn. Pioneer Oil Company Co.,* 172 S.W.3d, 545, 551 (Tenn. 2005). Several factors must be considered to evaluate the reasonableness of a risk. *McCall v. Wilder*, 913 S.W.2d, 150, 153 (Tenn. 1995).

In *Coln*, the Tennessee Supreme Court similarly examined general negligence principles like this, citing the *McCall* factors to assess the reasonableness of a risk:

> In *McCall v. Wilder, supra,* we explained that "a risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm."
>
> Among the factors for consideration are
>
> the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

*Coln*, 966 S.W.2d at 39 (*citing McCall v. Wilder*, 913 S.W.2d at 153 (Tenn. 1995)).

*Coln* further reiterates the factors listed in *McCall*, by enumerating six non-exhaustive factors in the comparative fault analysis:

> (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Coln*, 966 S.W.2d at 44. Ultimately, a court "must balance the foreseeability and gravity of the potential risk of harm to a plaintiff against the burden posed on the defendant in protecting against

15

that harm." *Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998). A risk is deemed unreasonable if "the foreseeable probability and gravity of harm imposed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented harm." *Id.* (*citing McCall*, 913 S.W.2d at 153).

Notably, in their briefing, Defendants do not cite these factors or engage in any of this comparative fault analysis.

### 2. Ms. Carrell's "duty to see" the wheel stop.

Defendants focus on Ms. Carrell's duty "to see" the wheel stop because it was in plain sight. (Defendants' Memorandum, p. 7-8). The cases cited by Defendants are distinguishable on their facts. The Court affirmed summary judgment in the *Berry* case, which involved a plaintiff who slipped on a puddle of oil "large enough to soak the entire back side of her body and the back of her head." *Berry v. Houchens Market of Tennessee, Inc.*, 253 S.W.3d 141, 148 (Tenn. Ct. App. 2007). The Court observed in *Berry* that the puddle of oil was "not just a spot or two of oil" and that plaintiff demonstrated an "absolute lack of attention to where she was walking." *Id.* In that circumstance, it was appropriate for the Court to find that plaintiff was at least 50% responsible for her fall and injury. *Id.*

Similarly, the *Holland* case cited by Defendants is distinguishable. *Holland v. K-VA-T Food Stores, Inc.*, No. E2013-02798-COA-R3-CV, 2015 WL 151373 (Tenn. Ct. App. Jan. 13, 2015). The *Holland* case involved a woman who tripped over a curb that the Court found to be a "visible and physical barrier" that was located in an expected place between a grocery store parking lot and a bank drive-through area. *Id.* at \*3. Defendants fail to mention that the plaintiff in *Holland* admitted that she fell when she was walking backward. (Defendants' Memorandum, p. 7-8). The Court found that plaintiff caused her own injury because she was walking backward. *Id.*

Defendants' comparative fault analysis plainly attempts to resurrect the pre-*Coln* "open and obvious" doctrine. At least two cases cited by Defendants are really more concerned with a duty analysis and do not involve any consideration of comparative fault at all. *See Herbison v. Hansen Chrysler Plymouth, Inc.*, No. 01A01-9710-CV-00594, 1998 WL 485668, *3 (Tenn. Ct. App. Aug. 19, 1998) (absolving defendant of any duty to act with reasonable care, which "renders unnecessary any consideration of comparative negligence."); *see also Lunsford v. K-VA-T Food Stores, Inc.*, No. E2019-01272-COA-R3-CV, 2020 WL 1527002, at *9 (Tenn. Ct. App. Mar. 31, 2020) (finding no duty was owed by Defendant and, "[a]s a result of this holding, the issue of comparative fault raised by Defendant is pretermitted."). Yet, Defendants' basis for moving for summary judgment relies exclusively on the comparative fault of the parties.

### 3. Ms. Carrell's "failure to familiarize herself" with her pathway.

Of the comparative fault factors listed in *Coln*, Defendants focus primarily on Ms. Carrell's alleged "fail[ure] to familiarize herself with the nature of her pathway or take an alternative path." (Defendants' Memorandum, p. 9). Two of the cases cited by Defendants, *Reed* and *Risher*, are remarkably similar to each other, but quite different from Ms. Carrell's case. *See Reed v. McDaniel*, No. W2009-01384-COA-R3-CV, 2010 WL 623619 (Tenn. Ct App. Feb. 23, 2010); *see also Risher v. United States*, No. 08-2249, 2011 WL 61675 (W.D. Tenn. Jan 7, 2011). In the *Reed* case, the plaintiff fell when he crossed an obviously rotten wooden floor even though he was fully cognizant that the floors were rotting and told himself to be "real careful" when traversing the floor. *Reed*, 2010 WL 623619, at *5. Similarly, in *Risher*, the plaintiff encountered a hole in the ground that was, at its deepest point, a foot deep, and which was filled in places with concrete and rock. *Risher*, 2011 WL 61675, at *5. Plaintiff even stopped to examine the hole before crossing it and decided not to take a path around the hole that he had previously taken. *Id.* In both cases, the

courts found that the plaintiffs were primarily responsible for their own injuries and, thus, could not recover. *Id.*, *Reed*, 2010 WL 623619, at *5. In both of these cases, plaintiffs, unlike Ms. Carrell, were specifically aware of and acknowledged their risks of proceeding where they were walking just before they fell. In such circumstances, the courts appropriately concluded that plaintiffs were more than fifty percent at fault for their injuries.

### 4. Cases factually similar to Ms. Carrell's case indicate that summary judgment should be denied.

A number of post-*Coln* premises liability cases with factual scenarios more similar to Ms. Carrell's case than either *Reed* or *Risher* confirm that this case is not appropriate for summary judgment. For instance, in the case of *Cary v. Kroger*, the plaintiff tripped and fell on a small speed bump in a Kroger parking lot that she had visited many times in the past. *Cary v. Kroger*, No. 1:09-0064, 2010 WL 3420351 (M.D. Tenn. Aug. 26, 2010). There was testimony in *Cary* from several Kroger employees about how busy the parking lot was and how pedestrians in the parking lot have to be mindful of the parking lot vehicle traffic. *Id.* at *1-3. Plaintiff testified that she did not look at the ground as she walked, but was watching for traffic. *Id.* at *1. The Court ultimately concluded that summary judgment should be denied. *Id.* at *4. In its ruling, the Court said the following:

> [W]hether Plaintiff was negligent because she watched passing traffic rather than the ground where she walked, and if so, whether her negligence was fifty percent or greater than any negligence of Kroger is a classic jury question that cannot be resolved on this summary judgment record.

*Id.*

Similarly, in *Wood v. Wal-Mart Stores East, LP*, the Court denied defendant's motion for summary judgment in a fact pattern where plaintiff tripped while stepping onto a sidewalk that abutted the Wal-Mart store parking lot. *Wood v. Wal-Mart Stores East, LP*, No. 3:11-1081, 2013 WL 3010698, at *1 (M.D. Tenn. June 18, 2013). Plaintiff had been to this Wal-Mart store

"approximately once every two weeks for the past fifteen years, and had never before tripped." *Id.* When walking toward a side entrance to the store, plaintiff "noticed approaching traffic and picked up the pace a little bit." *Id.* She declined to use an available crosswalk to access the store, but headed directly toward the store from where she had parked, which caused her to encounter the variation in the connection between the parking lot and the sidewalk. *Id.* In denying summary judgment on these facts, the Court found as a matter of law as follows:

> Wal-Mart owed a duty to Plaintiff to keep its parking lot in a reasonably safe condition, along with its sidewalks, and the transition from the parking lot to the sidewalk. The Court also finds that **it was reasonably foreseeable that a Wal-Mart shopper would cross at areas other than the designated sidewalk, that traffic could distract pedestrians from constantly looking down, and that a slight elevation between the asphalt and the sidewalk could result in a customer tripping, even though the sidewalk and the parking lot were not the same color.** The Court also concludes that whether Wal-Mart breached its duty is a question for the jury to decide.

*Id.* at \*3 (emphasis added). *See also Watson v. Kohl's Department Store, Inc.*, No. 3:15-0043, 2016 WL 7742777, at \*2-3 (M.D. Tenn. May 20, 2016) (denying summary judgment where plaintiff tripped on a ramp that was painted blue and yellow to alert patrons as to its existence, but where also at least three patrons had previously fallen on the same ramp). Each of these cases is instructive in how to evaluate comparative fault in a factual scenario like Ms. Carrell's, where a jury could reasonably conclude that the Defendants were more than 50% at fault for Ms. Carrell's injuries.

### 5. The additional facts cited by Ms. Carrell indicate that summary judgment should be denied.

The additional facts cited by Ms. Carrell in response to the Motion for Summary Judgment, as well as the inferences to be drawn from all of the facts presented at this stage indicate, however, that reasonable minds could differ on the question of who bears greater fault for Ms. Carrell's injuries. When Ms. Carrell walked out the store door, Ms. Carrell used her right hand to push her

19

glasses up the bridge of her nose. (Carrell dep., 153:10-17; Ex. 19 to Carrell dep., screenshot at 05:38:36). She then looked to the right in the direction of the SUV to see where the car was. (Id., 76:11-14; 86:12-87:1). She was also paying attention to oncoming traffic, and trying to protect her ten-year old granddaughter from traffic. (Id., 143:12-17). She determined that walking through the vacant accessible space to her right was the shortest route to get to the vehicle. (Id., 94:7-8).

When she drifted into the vacant handicapped accessible space, Ms. Carrell's right foot caught the corner of a wheel stop located at the end of a vacant handicap parking space, and she fell. (Id., 76:24-77:5; 89:1-6; 154:1-6). Ms. Carrell had not been looking down at her feet because she had not perceived any danger in that area when she previously entered the store. (Id., 89:21-90:8; 143:7-17).

For their part, the Defendants specifically knew of numerous trip and fall incidents over wheel stops, at least 196 reported falls at Buc-ee's stores with the same design as the Crossville store and at least 60 reported falls at the Crossville Buc-ee's store, both in the time period from May 19, 2022 to December 2, 2023, the date of Ms. Carrell's fall. (Justilian dep., 93:6-11; Stammer Declaration, ¶ 16). To make the wheel stops more visible, reflective red and white tape was added. (McGeorge dep. 39:2-40:25; Harness dep., 38:22-40:22; Laios dep., 82:14-18; Fitzpatrick dep., 37:13-38:5; 43:17-24; 45:4-14). Even then, customers continued to routinely trip over the wheel stops. (McGeorge dep., 43:18-22; Laios dep., 76:6-9; Justilian dep., 100:4-9; Fitzpatrick dep., 71:22-24).

Buc-ee's employees, moreover, knew that customers were free to walk anywhere in the parking lot, they did not always use the crosswalk, and would walk through vacant handicapped accessible parking spaces when entering and exiting the store. (Harness dep., 54:13-24; 95:7-9; Laios dep., 93:6-15; Matthews dep., 44:20-22; 45:3-10). As Ms. Carrell described the Buc-ee's

parking lot, "[t]he situation at Buc-ee's is everybody walks everywhere…If you just go and sit in the parking lot and watch, they don't walk in crosswalks." (Carrell dep., 144:5-14). As acknowledged by then-Crossville store General Manager Wesley Harness, there are a number of known distractions in the parking lot, including items for sale, crowds of people, constant car traffic, and having to look after children. (Harness dep., 93:19-95:5; McConnell dep., 11:16-12:18).

Despite the knowledge that numerous people were falling at the wheel stops, Buc-ee's did not consider removing them. (McGeorge dep. 44:1-10; Laios 78:6-19; Fitzpatrick dep., 73:16-20). Removing the wheel stops in the accessible parking spaces at the Crossville Buc-ee's store was a feasible, safer alternative that would have eliminated customer injuries over wheel stops. (Stammer Declaration, ¶¶ 18, 22). Indeed, Buc-ee's stores that opened more recently do not use the wheel stops that caused Ms. Carrell's injuries, as well as so many other people's injuries, indicating that Buc-ee's could have chosen to remove the wheel stops from the Crossville store, but simply declined to do so. (Id., ¶¶ 19, 20).

These facts are all relevant to the question of comparative fault. In particular, they are relevant to the reasonableness of Ms. Carrell's decision to pass through the vacant handicapped accessible parking spot because that was the most direct route to her son's vehicle. These facts are furthermore probative of the reasonableness of Ms. Carrell's decision not to look at her feet when she exited the store, but to look instead at the traffic in the busy parking lot as she walked her ten-year old granddaughter to the car. These facts are also relevant to the reasonableness of Buc-ee's decision to leave the wheel stops in place even when as many as sixty people before Ms. Carrell had tripped over them at the Crossville store alone.

21

In light of the additional material facts raised by Ms. Carrell and drawing all inferences from the facts in favor of Ms. Carrell, reasonable minds could differ in answering the question of whether her fault was equal to or greater than that of the defendants. Accordingly, summary judgment should be denied. *Hatfield v. Circle K Stores, Inc.*, No. 1:17-cv-82-SKL, 2018 WL 11463581, * 5 (E.D. Tenn. Mar. 13, 2018) (*citing Staples v. CNL Assoc., Inc.*, 15 S.W.3d 83, 91-92 (Tenn. 2000)).

### III. Defendants have not shown by a preponderance of the evidence that Tenn. Code Ann. § 29-39-104(e) protects them as a matter of law from being assessed punitive damages.

In their Motion for Summary Judgment, Defendants have moved for a partial summary judgment on the issue of punitive damages. Punitive damages are authorized under Tennessee law by statute, Tenn. Code Ann. § 29-39-104. Those damages may be awarded only "if the claimant proves by clear and convincing evidence that the defendant against whom punitive damages are sought acted maliciously, intentionally, fraudulently or recklessly." Tenn. Code Ann. § 29-39-104(a)(1).

Defendants contend that summary judgment is warranted on this issue pursuant to Tenn. Code Ann. § 29-39-104(e), which provides as follows:

> Punitive damages shall not be awarded in any civil action when a defendant demonstrates by a preponderance of the evidence that it was in substantial compliance with applicable federal and state regulations setting forth specific standards applicable to the activity in question and intended to protect a class of persons or entities that includes the plaintiff, if those regulations were in effect at the time the activity occurred.

Tenn. Code Ann. § 29-39-104(e). The regulations that Defendants contend are applicable to Ms. Carrell's claim are the 2010 ADA Standards for accessible design codified at 28 C.F.R. Part 36, specifically sections 208, 502, and 206, as well as the 2018 International Building Code ("IBC"),

"as adopted by the State of Tennessee," specifically IBC chapter 11. (Defendants' Memorandum, p. 12-13).

The stated purpose of the cited federal regulations is to implement subtitle A of title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181-12189, which "prohibits discrimination on the basis of disability by covered public accommodations and requires places of public accommodation and commercial facilities to be designed, constructed, and altered in compliance with the accessibility standards established by this part." 28 C.F.R. § 36.101(a). The regulations prescribe specifications that "make it easier for people with disabilities to obtain protections under the ADA." 28 C.F.R. § 36.101(b). The sections of the regulations cited by Defendants, sections 208, 502, and 206, establish design specifications for accessible parking spaces and accessible routes at places of public accommodation. See 2010 ADA Standards for Accessible Design, *available at* https://www.ada.gov/law-and-regs/design-standards/2010-stds/#206-accessible-routes (last accessed March 9, 2026).

These regulations are not intended for the protection of all people or pedestrians generally. These regulations are specifically concerned with protecting full access to public accommodations for people with disabilities. 28 C.F.R. § 36.101(a). Ms. Carrell is not alleged to be disabled and, therefore, is not in the "class of persons or entities" that the regulations are "intended to protect." Tenn. Code Ann. § 29-39-104(e). Moreover, Ms. Carrell's activity in the Buc-ee's parking of entering and exiting the store in her unassisted, able-bodied way is not the "activity in question" to which the regulations apply. Id.

Similarly, Chapter 11 of the IBC "set[s] forth requirements for accessibility of buildings and their associated sites and facilities for people with physical disabilities." 2018 International Building Code, Chapter 11 (Nov. 2021) available at

23

https://codes.iccsafe.org/content/IBC2018P6/chapter-11-accessibility (last accessed March 10, 2026). While several Tennessee municipalities, including Crossville, have adopted the 2018 International Building Code, it has not been adopted by the state of Tennessee.[1] *See e.g., Caldwell v. Ruby Falls, LLC*, 674 S.W.3d 899 (Tenn. Ct. App. 2023) (concerning the applicability of a certain IBC provision because the City of Chattanooga had adopted the IBC via ordinance). As such, it is not relevant to Defendants' argument because Tenn. Code Ann. § 29-39-104(e) is implicated only when defendants show "substantial compliance with federal and state regulations." Tenn. Code Ann. § 29-39-104(e). The statute does not apply when a defendant shows substantial compliance with a local ordinance.

In addition, the 2010 ADA Standards for Accessible Design ("ADA Standards") did not mandate the use of a wheel stop like the one that caused Ms. Carrell to trip. (Stammer Declaration, ¶ 4). While the ADA Standards require designs that prevent vehicle overhangs from intruding into accessible routes, they do not require a specific design to comply with this standard. (Id., ¶ 6). The bollard at the end of the accessible parking space next to the wheel stop would, by itself, satisfy the requirements of the ADA Standards. (Id., ¶ 7). Buc-ee's could have removed the wheel stops in the accessible parking spaces at the Crossville Buc-ee's store and still be compliant with the ADA Standards because the bollards alone were sufficient. (Id., ¶ 11).

In moving for summary judgment on the issue of punitive damages under Tenn. Code Ann. § 29-39-104(e), Defendants point to compliance with regulations that do not actually apply to this plaintiff or the circumstances of this case. As such, Defendants have not shown by a preponderance

---

[1] Without citation to any legal source, Defendants state that the 2018 International Building Code has been "adopted by the State of Tennessee." (Defendants' Memorandum, p. 13). Counsel for Plaintiff has found no authority to support this assertion. See Stammer Declaration, ¶ 3.

24

of the evidence that Tenn. Code Ann. § 29-39-104(e) protects them as a matter of law from being assessed punitive damages.

Transportation engineer Robert E. Stammer has opined that Buc-ee's could have removed the wheel stops in the accessible parking spaces at the Crossville Buc-ee's store and still be in compliance with the ADA Standards because the bollards at the end of the accessible parking spaces alone were sufficient. (Id.) In making this motion, Defendants essentially argue that a jury should not have the power to decide whether to assess punitive damages when Buc-ee's made a design choice that building and code regulations did not compel and that caused over 250 people to fall in the year and half before Ms. Carrell fell. Defendants' partial motion for summary judgment on the issue of punitive damages should be denied.

### **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

*s/Neal Agee, Jr.*
Neal Agee, Jr. BPR #9328
AGEE & TINSLEY
*Attorney for Plaintiff*
406 West Main St. Suite A
Lebanon, TN 37087
(615) 444-0001
(615) 444-3992 (fax)
neal@ageefirm.com

Tyler Chance Yarbro, BPR #023553
DODSON PARKER BEHM & CAPPARELLA, PC
*Attorney for Plaintiff*
1310 6th Avenue North
Nashville, TN 37208
(615) 254-2291
(615) 726-2241 (fax)
tyarbro@dodsonparker.com
*Counsel for Plaintiff*

25

**<u>CERTIFICATE OF SERVICE</u>**

       I certify that on March 11, 2026, I electronically filed the foregoing with the Clerk of Court for the U.S. District Court Middle District of Tennessee, through the Court's Electronic Case Filing System, which will automatically serve all counsel of record listed below:

       R. Brandon Bundren, BPR #30985
       Marlee G. Sacks, BPR #42072
       BRADLEY ARANT BOULT CUMMINGS, LLP
       *Counsel for Defendants*

                         *s/Neal Agee, Jr.*
                         Neal Agee, Jr.