# In The Matter Of:

*LISA CARRELL v.*

*BUC-EE'S TENNESSEE, LLC and BUC-EE'S, LTD.*

*Wesley Harness*

*July 30, 2025*

*Colleen Hansen, LCR, RPR*

Min-U-Script® with Word Index

EXHIBIT 3

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| LISA CARRELL, | ) Case No. |
| | ) 2:24-CV-00080 |
| Plaintiff, | ) |
| | ) Judge Waverly D. |
| v. | ) Crenshaw, Jr. |
| | ) |
| BUC-EE'S TENNESSEE, LLC | ) Magistrate Judge |
| and BUC-EE'S, LTD., | ) Alistair E. |
| | ) Newbern |
| Defendants. | ) |
| | ) JURY DEMAND |

_____

VIDEO DEPOSITION OF

WESLEY HARNESS

Wednesday, July 30th, 2025
_____

APPEARANCES:

For the Plaintiff:   Mr. Neal Agee, Jr.
                     Agee & Tinsley
                     406 West Main Street, Suite A
                     Lebanon, TN 37087


For the Defendants: Mr. Ryan N. Kilpatrick
                     Bradley Arant Boult Cummings LLP
                     1221 Broadway, Suite 2400
                     Nashville, TN 37203

                     Ms. Kortney Branum
                     11200 Broadway Street, Suite 2332
                     Pearland, TX 77584


Also Present:        Mr. Travis Temples, Videographer


Stenographically Reported by:
Colleen Hansen, LCR, RPR

EXHIBIT 3

The video deposition of WESLEY HARNESS was taken by counsel for the Plaintiff at Holiday Inn Express, 560 Peavine Road, Crossville, TN 38571, Wednesday, July 30th, 2025, beginning at approximately 9:00 a.m., for all purposes allowed under the Federal Rules of Civil Procedure.

It is agreed that Colleen Hansen, Licensed Court Reporter, Registered Professional Reporter, may swear the witness, take the deposition, and afterwards reduce same to typewritten form, and that the reading and signing of the completed deposition by the witness was not discussed.

All formalities as to caption, certificate, transmission, filing, et cetera, are waived.  All objections except as to the form of the questions are reserved to on or before the hearing.
_____


INDEX

WESLEY HARNESS:                                    Pages
   Examination by Mr. Agee .................. 4-105

EXHIBITS

| Number | Description | Page |
|--------|-------------|------|
| 1 | Front view of store | 26 |
| 2 | Front walkway | 26 |
| 3 | Handicap space with striping | 49 |
| 4 | Close up of handicap space | 49 |
| 5 | Photo - measurement 7 1/2 ft | 50 |
| 6 | Photo - measurement 6 ft | 50 |
| 7 | Photo - measurement 4 ft | 50 |
| 8 | Wesley Harness Incident Reports - Crossville, TN | 79 |
| 9 | Crossville, TN Incident Reports | 84 |
| 10 | Clahoun, GA Incident Reports | 91 |
| 11 | Wesley Harness Incident Reports - Calhoun, GA | 105 |

Case 2:24-cv-00080    Document 72-3    Filed 03/11/26    Page 4 of 12 PageID #: 773

EXHIBIT 3

A.    Correct.

Q.    So you were there for the grand opening of Buc-ee's in Crossville?

A.    Yes.

Q.    Were the design of the parking lots ever changed or modified while you were the manager at the store?

A.    I'm not sure I understand that question completely.

Q.    Okay.  You've looked at a -- at a couple of pictures of the store.  Can you recall any changes to the design of that handicap parking area on -- at either entrance of the store?

A.    I don't recall it being changed, no.

Q.    And did they occasionally repaint the blue lines?

A.    Yes.

Q.    Other than repainting the blue lines, they -- the handicap parking spots remained unchanged from the time the store opened until you left?

A.    I don't recall any real modifications to it.

Q.    Do you recall that reflective tape was added to it?

A.    We did add reflective tape, yes.

Q.    I'm going to pass a couple of more pictures.

The picture on your left, that's a closer-up view of the front of the Crossville store; correct?

A.      Correct.

Q.      And you can see that when this particular picture was taken, that the -- there was a -- a place for the outline of the wheelchair.  It looks like it needs to be repainted; doesn't it?

A.      It is worn.

Q.      Okay.  So during the -- during the course of your tenure as the general manager at that store, you know that they repainted those areas?

A.      Yes.

Q.      Did the location of the wheel stops ever change?

A.      I don't believe so, no.

Q.      Did the location of the signpost with the handicap parking sign, did they ever change?

A.      I don't believe so, no.

Q.      Did the relationship of those posts as far as how far apart they were, did that ever change?

A.      I don't believe so.

Q.      Do you remember what color the wheel stops were when the store opened?

A.      I do not recall when the store first opened, no.

Q.      Do you think that the -- when the store was opened, that this red and white-looking tape that's shown in these pictures, was that on the wheel stops?

A.      It was not.

Q.      You distinctly remember that?

A.      Yes.

Q.      When was the red and white tape added to the wheel stops?

A.      I don't remember exactly when it was added.

Q.      Why was it added?

A.      We're always looking for ways to improve the safety of the store, and I believe we just saw that as an opportunity to make things, you know, safer for our guests.

Q.      And say -- when you saw it as an opportunity to make it safer for guests, that was because guests were tripping and falling over the wheel stops; weren't they?

A.      It was as much that as it was so that guests pulling into the parking spaces wouldn't run into the tire stops and just -- just any number of reasons, really.

Q.      Had there been a problem with guests pulling into the parking spaces and running into the tire stops?

EXHIBIT 3

parking spots.  Are those spaces between parking spots where people are able to walk?

A.      They are marked pedestrian crosses, yes.

Q.      And when the -- when the adjacent parking spots are empty, is there any rule or prohibition against customers walking through empty handicap parking spots?

A.      I believe they are clearly marked as where people are supposed to walk.

Q.      Is there a sign anywhere that says "Walk Here Only"?

A.      There is not.

Q.      And do people routinely, in your experience having been a manager of this store for more than three years, do they routinely walk through empty parking spots?

A.      I would say the vast majority use the crosswalks, but there are several guests that will walk wherever they decide to walk, yeah.

Q.      Is there any prohibition against that?

A.      What do you mean by "prohibition"?  I'm sorry.

Q.      Is there a sign that says "Do Not Walk Here"?

A.      There is no sign, no.

Q.      Do you fault customers for cutting through an

Number 11, you did participate in, either as a witness or manager preparing the report; correct?

A.     Yes.  I'm the manager on duty in those reports.

Q.     I realize you weren't keeping up with the number of reports that were made in Crossville prior to my client's fall, but now I have showed you there were 60 reports prior to her fall.

A.     Yes, sir.

Q.     Do you agree that these tire stops are a trip hazard at the store in Crossville, Tennessee?

A.     I do not agree with that.

Q.     Sixty-one people fell in the time period that we've described, and you don't consider that to be evidence of a trip hazard?

MR. KILPATRICK:  Object to the form.

THE WITNESS:  I believe that we have well-marked pedestrian crossing areas, I believe that our tire stops are very identifiable, and I believe that it is very difficult to control where somebody's attention is as they're walking through the parking lot.

BY MR. AGEE:

Q.     It's impossible to control what people's attention is when they're walking through the parking

lot; correct?

A.     That's correct.

Q.     Some people have small children they have to watch; don't they?

A.     They do.

Q.     Some people are mobility impaired; aren't they?

A.     They are.

Q.     Some people are looking for the -- the -- the car when they go to -- when they're going back to their car; aren't they?

A.     They are.

Q.     People are watching because they might get run over by traffic, crossing between the gas pumps and the entrance to the store; correct?

A.     I could only assume so, sure.

Q.     There are cars moving through the parking lot constantly that people that are on foot need to be watching for; aren't there?

A.     Yes, sir.

Q.     Your store is -- is designed to entice people to enter.  You put things out for people to look at; don't you?

A.     We do.

Q.     There's a lot of distractions for the people

Case 2:24-cv-00080    Document 72-3    Filed 03/11/26    Page 10 of 12 PageID #: 773

EXHIBIT 3

that are walking through that parking area; aren't they?

MR. KILPATRICK: Object to the form.

THE WITNESS: Yeah. That's why we try to have the -- the clearly identifiable crosswalk.

BY MR. AGEE:

Q. But you understand that people do walk through the empty parking spots?

A. They do.

Q. Buc-ee's should be prepared for people to walk through empty parking lots; shouldn't they?

MR. KILPATRICK: Object to the form.

THE WITNESS: Again, I think our preparation is that we have clearly identified crosswalks.

BY MR. AGEE:

Q. If the wheel stops were not required, would there be any reason to leave them there so that more people could fall on them?

A. I -- I can't answer that. I don't know how they make those decisions.

Q. So you don't feel bad about 60 people falling in that period of time?

MR. KILPATRICK: Object to the form.

THE WITNESS: I don't like anybody

REPORTER'S CERTIFICATE

I, Colleen Hansen, Licensed Court Reporter, for the State of Tennessee at large, do hereby certify that I reported the foregoing proceedings at the time and place set forth in the caption thereof; that proceedings were stenographically reported by me; and that the foregoing proceedings constitute a true and correct transcript of said proceedings to the best of my ability.

I FURTHER CERTIFY that I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of these proceedings.

I FURTHER CERTIFY that I am duly licensed by the Tennessee Board of Court Reporting, as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of August, 2025.

_____

Colleen Hansen, LCR #879

Expiration Date: 6/30/2026

EXHIBIT 3