UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

LISA CARRELL,                    )
PLAINTIFF                        )
                                 ) No. 2:24-CV-00080
v.                               ) Judge Waverly D.
                                 ) Crenshaw, Jr.
                                 ) Magistrate Judge Alistair
                                 ) E. Newbern
BUC-EE'S TENNESSEE, LLC AND )    JURY DEMAND
BUC-EE'S, LTD.,                  )
DEFENDANTS                       )

-------------------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

DALE FITZPATRICK

DECEMBER 17, 2025

-------------------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF DALE

FITZPATRICK, produced as a witness at the instance of

the Plaintiff and duly sworn, was taken in the

above-styled and numbered cause on the 17th day of

December, 2025, from 9:33 a.m. to 12:13 p.m., before

Haleigh Hernandez, Certified Shorthand Reporter in and

for the State of Texas, reported by computerized

stenotype machine at the offices of Bradley Arant Boult

Cummings LLP, JPMorgan Chase Tower, 600 Travis Street,

Suite 5600, Houston, Texas 77002, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

NELL McCALLUM & ASSOCIATES, INC. EXHIBIT 5

APPEARANCES

FOR PLAINTIFF:

Mr. Neal Agee, Jr. (present via Zoom)
Agee & Tinsley
406 West Main Street, Suite A
Lebanon, Tennessee 37087
Telephone: (615) 444-0001
E-mail: neal@ageefirm.com

FOR DEFENDANTS:

Mr. R. Brandon Bundren
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
Telephone: (615) 244-2582
E-mail: bbundren@bradley.com
-- and --
Mr. H. Tracy Richardson, III
In-house Counsel for Buc-ee's, LTD.

ALSO PRESENT:

Michael Cammack, Videographer
Brittany Manis (present via Zoom)

NELL McCALLUM & ASSOCIATES, INC. EXHIBIT 5

INDEX

                                                    PAGE

Appearances ....................................2

DALE FITZPATRICK

    Examination by Mr. Agee ....................4

Signature and Changes ..........................88

Court Reporter's Certificate ...................90


                        EXHIBITS

EXHIBIT          DESCRIPTION                    PAGE

1                LinkedIn Page of Dale Fitzpatrick  34

2                Amended Notice of Video            36
                 Deposition of Defendant

3                Defendant's Responses and          36
                 Objections to Plaintiff's
                 Rule 30(B)(6) Amended Notice of
                 Deposition

4                Photos of Crossville, Tennessee,   65
                 Buc-ee's

any particular injury history or fall history regarding customers falling on the wheel stops at the store in Crossville?

A. No, sir.

Q. I take it that's -- strike that.

Do -- do you receive copies of customer personal injury forms when they are reported by the local travel centers?

A. No, I do not.

Q. Do they go to the claims department?

A. That is correct.

Q. Since you -- don't -- strike that question.

You've been in this position since 2022, correct?

MR. BUNDREN: Objection to form.

A. I've been in the pos- --

Q. (BY MR. AGEE) Well --

A. I'm sorry. Go ahead.

Q. How -- how long have you been in your position? I should have written that down.

A. At -- with -- at Buc-ee's, correct?

Q. Yes, sir.

A. Okay. Since 2020.

Q. Since 2020. Can you recall ever having received any notifications of customers being injured,

Did I state that correctly?

A. That is correct.

Q. Okay. There's not any particular mention of customer safety in that, is there?

A. I don't believe so, but it's implied within a retail environment.

Q. Do you agree that Buc-ee's has a duty to act with reasonable care to make their premises safe?

A. Yes.

Q. Do you agree that when customers fall onto concrete or asphalt, there's a risk of serious injury or death?

A. Yes.

Q. And do you agree that Buc-ee's has a duty to use reasonable care to prevent people from falling?

A. Yes.

Q. Do you know the number of people that had fallen -- tripped and fallen on wheel stops at the Crossville store prior to Lisa Carrell's fall?

MR. BUNDREN: Objection to form.

A. I do not.

Q. (BY MR. AGEE) Are you aware of the number of falls that Buc-ee's has -- strike that question.

In response to request for production documents, Buc-ee's has given me customer personal

Q. When was the tape added?

MR. BUNDREN: Objection to form.

Neil, what store are you talking about?

Q. (BY MR. AGEE) When was -- when was a decision made to apply red and white tape to these tire stops?

A. To the best of my knowledge, it was before my tenure. And that was done at the Robertsdale store in Alabama.

Q. Okay. It's your testimony that the red and white tape was applied at the store in Alabama that was open prior to 2020; is that correct?

A. That is correct.

Q. Are you aware that when the store in Crossville opened, there was no red and white tape on those tire stops?

MR. BUNDREN: Objection to form.

A. I believe that to be the case.

Q. (BY MR. AGEE) When was -- when was the decision made to apply red and white tape to the store in Crossville?

A. I don't have specific knowledge of the exact date that it occurred.

Q. What was the reason that the tape was applied at the store in Crossville?

A. To my knowledge, the general manager of the

Case 2:24-cv-00080    Document 72-5    Filed 03/11/26    Page 6 of 15 PageID #: 798
NELL McCALLUM & ASSOCIATES, INC.    EXHIBIT 5

store had reached out to legal.

Q. And why did he reach out to legal?

MR. BUNDREN: Objection to form.

A. I believe it was due to customer trip-and-falls over the tire stops.

Q. (BY MR. AGEE) Are you aware that I've taken the deposition of Mr. Harness? That's who you're referring to, isn't it?

MR. BUNDREN: Objection to form.

A. That would be correct. And the answer is yes.

Q. (BY MR. AGEE) Are you aware of what Mr. Harness said about the application of the red and white tape?

A. I am not.

Q. Was it a -- was it a store-based decision to place red and white tape, or was it done throughout the -- throughout the other stores in the chain?

MR. BUNDREN: Objection to form.

A. I'm going to have to ask for a point of clarification. When you say the "decision," are you asking about the original decision or a specific decision at another store?

Q. (BY MR. AGEE) I'm asking about the original decision to start applying red and white tape.

A. So, again, as a point of clarification, the

EXHIBIT 5

A. Yes, on the handicap parking stops.

Q. At all of the stores?

A. Correct.

Q. Why was the decision made that red and white tape, to begin with, had to be -- needed to be applied to the wheel stops?

A. Again, the original discussion predates my employment with Buc-ee's; but during my research for the parking tire stops, I was -- I was told that the general manager of the Robertsdale store at the time had suggested potentially adding the reflective tape to the parking stops and sought legal's guidance on the -- I guess, if that would be something that would be acceptable for him to apply.

Q. So you were -- you were not the -- a participant in that decision-making process, were you?

A. No, sir. That was before my employment.

Q. Was the red and white tape added to all of the stores at some time between the application of the tape at the Robertsdale store --

MR. BUNDREN: Object- --

Q. (BY MR. AGEE) -- and 2023?

MR. BUNDREN: Objection to form.

A. I'm sorry. I'm going to have to ask for clarification on that question one more time.

not all stores applied that sticker to their handicap parking stops based on the fact that it was not an issue at their store.

Q. Do you have any evidence to support your belief that not all of the stores put the tape on them?

MR. BUNDREN: Objection to form.

A. I don't have particular evidence, no. But as -- again, as I stated previously, when Wes reached out to legal, the -- I guess, he was given guidance to apply the tape. So if a particular general manager noted an issue with parking stops at their store, the guidance was for them to put that tape on their parking stops in the handicap section.

Q. (BY MR. AGEE) This understanding, was it ever memorialized in writing?

A. To the best of my knowledge, no.

Q. This was just related to store managers on a case-by-case basis?

A. To my knowledge, yes, that is correct.

Q. Did these alterations -- were -- were these alterations approved by corporate?

MR. BUNDREN: Objection to form.

A. So it's not an approval per se as guidance from legal -- the legal department to apply that tape.

Q. (BY MR. AGEE) Are you telling me that the

NELL MCCALLUM & ASSOCIATES, INC.  EXHIBIT 5

long pause.

A. So I'm sorry. I -- I lost the -- the question. Can you repeat it one more time?

Q. (BY MR. AGEE) Are -- your testimony today, do I understand it to be that legal gave guidance to the -- to the various general managers at the various stores to add red and white tape to the tire stops? Correct?

MR. BUNDREN: Objection to form.

A. To the best of my knowledge, the stores that were discussed with legal or sought guidance on a case-by-case basis, it wasn't a blanket application. But those stores that did seek guidance from legal were told to apply the tape, to my -- to the best of my knowledge.

Q. (BY MR. AGEE) To the best of your knowledge, did all of the stores eventually apply red and white tape?

MR. BUNDREN: Objection to the form.

A. No.

Q. (BY MR. AGEE) Which stores did not apply red and white tape?

A. Again, I -- I -- as I stated before, I don't have a specific list of stores who did and didn't because the guidance was given on an as-needed basis.

Q. What is the -- what is your description of the

A.   I am not.

Q.   Have you ever heard that such a lawsuit was filed?

A.   I have not.

Q.   Is it your job as a health and safety manager to proactively try to discover problems cus- -- that affect customers' safety?

A.   Yes.

Q.   And is it part of your job to mitigate those hazards?

A.   I don't specifically mitigate, but I consult and work with store teams to come up with possible solutions to mitigate that.  But I specifically do not implement those mitigation.

Q.   Are you aware whether people are still tripping and falling over these wheel stops after the tape and the metal reflectors have been added?

        MR. BUNDREN:  Objection to form, asked and answered.

A.   I do not have specific knowledge of individual cases, no.

Q.   (BY MR. AGEE)  Do you have general knowledge that people are still tripping and falling?

A.   I do believe they are, yes.

Q.   Have you done anything to try to further

prevent." The -- you said that, right? Then you said -- and did -- and you first -- strike that whole question.

Did you say that you thought that the wheel stops are required to prevent vehicle encroachment?

A. I -- I -- required not from a statutory but we -- we -- we as a company are requiring them to be placed down to prevent vehicles from driving through. I didn't mean it in the literal sense of a statutory requirement.

Q. So the wheel stops are there because Buc-ee's wants them to be there, correct?

A. To help prevent vehicle encroachment or driving through the front plate glass of the store, yes.

Q. And you have -- have you investigated whether bollards could be placed in those locations so that there would be no need for the wheel stops to be there?

MR. BUNDREN: Objection to form.

A. I have not.

Q. (BY MR. AGEE) Why have you not investigated that possibility?

A. Because the current design that we have meets the ADA requirements with the handicap sign, the concrete sleeve that protects the post, and the

NELL McCALLUM & ASSOCIATES, INC.    EXHIBIT J

Q. And as part of court-ordered discovery, Buc-ee's has given us customer personal injury reports from December 3rd, 2023, up until October 20th of 2025; and there have been a total, I believe, of over 400 falls in that period of time. You were not aware of that number, were you?

MR. BUNDREN: Objection to form.

A. 400 at which -- I guess I'm trying to understand which stores.

Q. (BY MR. AGEE) The travel centers outside of the state of Texas, including Crossville.

A. Okay. I was not aware of that number.

Q. Does that sound like to you that people are going to continue to trip and fall over these wheel stops?

MR. BUNDREN: Objection to form.

A. Again, as I've stated, there are many factors which go into whether or not someone would trip over a parking stop. And so I can't quantify that definitively.

Q. (BY MR. AGEE) Please let's list those factors for me.

A. Customers who do not use the provided crosswalks, customers who are not paying attention, having a conversation with someone they're walking with.

NELL McCALLUM & ASSOCIATES, INC.  EXHIBIT 5

Perhaps maybe looking at a phone. Perhaps running out of the store to go to a pump or to chase after a child or a family member. Again, there's many circumstances which would cause someone to cut through a parking space and not utilize the crosswalks which we provide at the entrance to each of our stores.

Q. Okay. You say that one of the causes would be that they were not paying attention, correct?

A. Correct.

Q. Is there any prohibition against walking through the handicap parking spot?

A. I mean, a reasonable person would utilize a striped walking path and not cut through a parking space.

Q. Are there any signs that tell people, "Do not walk through the parking space"?

A. Not to my knowledge.

Q. You talked about people running out of the store. Have you ever watched the videos of any of the falls?

MR. BUNDREN: Objection to form.

A. I have not watched a video of a fall, no.

Q. (BY MR. AGEE) In the claims department, I'm informed they get videos of every fall. Has anyone ever done a study to determine how many people were running

REPORTER'S CERTIFICATE

I, Haleigh Hernandez, a Certified Shorthand Reporter in and for the State of Texas, certify that this deposition transcript is a true and correct record of the testimony given by the witness named herein, after said witness was duly sworn by me. The witness was requested to review the deposition.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

I further certify that the amount of time used by each party at the deposition is as follows:

Mr. Agee - 2h15m
Mr. Bundren - 0h0m
Mr. Richardson - 0h0m

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 30th day of December, 2025.

/s/ Haleigh Hernandez

Haleigh Hernandez, CSR, RPR
Texas CSR No. 9371
Expiration: 03/31/2027
Nell McCallum & Associates
3560 Delaware, Suite 402
Beaumont, Texas 77706
Firm Registration No. 143
(409) 838-0333

NELL McCALLUM & ASSOCIATES, INC. EXHIBIT 5