**Robert E. Stammer, Jr., Ph.D., P.E.**
**212 Derby Glen Lane**
**Brentwood, TN 37027-4865**
**Phone: 615-504-4691**

FEB. 27, 2026

**Expert Witness Report**

**TO:**    Neal Agee, Esq.
Agee & Tinsley, Attorneys at Law
406 W. Main Street
Suite A
Lebanon, TN 37087

**FR:**    Robert E. Stammer, Jr., Ph.D., P.E.
212 Derby Glen Lane
Brentwood, TN 37027

**RE:**    Lisa Carrell v. Buc-ee's Georgia LLC

**REPORT DATE: February 27, 2026**

## Introduction

The first six sections of the following expert report document my Qualifications, Publications, Compensation, Listing of Other Cases, Discovery of New Evidence and Actions in this case. The following two sections offer Facts and Data and Expert Statements and Opinions regarding this pedestrian fall.

## Qualifications

1.      I am a transportation engineer with 1) a Bachelor's Degree in Civil Engineering from Vanderbilt University, 2) a Master's Degree in Civil Engineering (Transportation) from Georgia Institute of Technology and 3) a Doctor of Philosophy Degree from the University of Tennessee in Civil Engineering (Transportation). I am a Registered Professional Engineer in the State of Tennessee. I taught both undergraduate and graduate transportation engineering courses for the Civil and Environmental Engineering Department of Vanderbilt University's School of Engineering for over forty years. I first taught a transportation course at Vanderbilt as an adjunct professor in 1978 while being employed full-time by the TN Department of Transportation. I taught the same introductory course a second time in 1979. I left TDOT to attend the University of Tennessee in 1979. After completing my Ph.D. work, I was hired by Vanderbilt University as a full-time, tenure-track, transportation engineering professor in August of 1981 and was continuously employed by Vanderbilt University's Department of Civil and Environmental Engineering from 1981 until my "unofficial" retirement on August 15, 2015. I then became a Vanderbilt Professor Emeritus in

1

August of 2015 but was rehired as a Professor of the Practice in August of 2015 to continue my employment in the CEE department in the Vanderbilt School of Engineering until August of 2021.

2. Transportation courses routinely taught by me each year from 1981 through 2021 included upper-level undergraduate and graduate courses in Traffic Engineering and Transportation Systems Design, the undergraduate introductory course in Transportation Engineering, and other various transportation courses as demand dictated.

3. My professional transportation engineering career from 1972 to the present year of 2026 represents over 54 years of professional experience. My professional experience spans employment in academia (Georgia Institute of Technology, University of Tennessee, and Vanderbilt University), government (Tennessee Department of Transportation), and with three private consulting companies. The first consulting firm was John Coleman Hays and Associates, a former general civil engineering firm in Nashville. The second consulting firm was an Atlanta transportation consulting firm, Traffic Planning Associates. The third is my own firm, Stammer Transportation Engineering, Inc. (STE) which was incorporated in 1987.

**Publications Authored by Witness within the Preceding Ten Years**

None

**Compensation to be Paid for Study and Testimony**

Robert E. Stammer, Jr., Ph.D., P.E. charges $300.00/hour for Dr. Stammer's time for study, examination and general work. The hourly rate is $350.00/hour for testimonies and associated travel.

**Listing of Other Cases in Which the Witness Has Testified as an Expert at Trial or by Deposition**

See Appendix A.

**Discovery of New Evidence**

I will be glad to clarify and answer any questions regarding my expert opinions and the statements within this report. I also reserve the right to revisit my findings and opinions if further information becomes available.

**Actions**

As of the date of this report, I have received the following materials for my review:

**Item #1**    Photograph of wheel stop at Crossville (area where Ms. Carrell fell) and photograph of distance between wheel stop and bollard.

**Item #2**    Dropbox link with store plans for Calhoun, GA (ones from Full case) and store plans for Colorado store.

2

| | |
|---|---|
| **Item #3** | Dropbox link with 566 pages of store plans produced in Defendants' Supplemental Response to Plaintiff's First Set of Requests for Production of Documents #8 and list of design firm, general contractor and civil engineers. |
| **Item #4** | Deposition of Plaintiff's Rule 26 Expert – Brani – Calhoun, GA case. Deposition of Defendant's Rule 26 Expert – Lawson – Calhoun, GA case. |
| **Item #5** | Customer Personal Injury reports of all falls from all stores from 12/3/23-10/20/25 (including Crossville) in Defendants' Response to Plaintiff's Third Set of Requests for Production of Documents #1 and #3 with list of falls by store. |
| **Item #6** | Customer Personal Injury reports for Store #50 – Crossville, TN prior to 12/2/23 produced in Defendants' Response to Plaintiff's First Set of Requests for Production of Documents #1 with list of falls. |
| **Item #7** | Customer Personal Injury reports of all falls from all stores prior to 12/2/23 (except Crossville) in Defendants' Supplemental Response to Plaintiff's First Set of Requests for Production of Documents #3 with subfolders for each store's falls and list of falls by store. |
| **Item #8** | Exhibits 6-18 to Richard Sebastian's deposition (photographs of other stores). |
| **Item #9** | Video of Lisa Carrell's Fall, Lisa Carrell's Customer Personal Injury form and Lisa Carrell's Customer Statement & Information form. |
| **Item #10** | Videos of other Crossville store falls prior to December 2, 2023, produced in Defendants' Response to Plaintiff's Second Set of Requests for Production of Documents #1. |
| **Item #11** | AI summary of Richard Sebastian's deposition. |
| **Item #12** | AI summary of Dale Fitzpatrick and JJ Justilian's depositions. |
| **Item #13** | Exhibit 4 of Dale Fitzpatrick's deposition (photographs of Crossville store). |
| **Item #14** | Photographs of wheel stop Carrell fell over (circled) and additional photographs of Crossville store. |
| **Item #15** | Exhibits 1, 3, and 4 to Wesley Harness' deposition (pictures of store #50 – Crossville, TN). |
| **Item #16** | Exhibit 4 to Richard Sebastian's deposition (a portion of store #50 – Crossville, TN site plans from Defendants' responses to Plaintiff's First Set of Requests for Production of Documents #7). |

3

| | |
|---|---|
| **Item #17** | Exhibit 5 to Richard Sebastian's deposition – (collective) a portion of Store #42 (Baldwin, AL); #43 (Leeds, AL); #46 (St. Johns County, FL); #47 (Daytona Beach, FL); #51 (Warner Robins, GA); #52 (Calhoun, GA); #53 (Florence, SC); #55 (Richmond, KY) site plans from Defendants' supplemental responses to Plaintiff's First Set of Requests for Production of Documents #8. |
| **Item #18** | Transcript of Ashley McGeorge's deposition. |
| **Item #19** | Transcript of Laura McConnell's deposition. |
| **Item #20** | Transcript of Timothy Laois' deposition. |
| **Item #21** | Transcript of Wesley Harness' deposition. |
| **Item #22** | Transcript of Dale Fitzpatrick's deposition. |
| **Item #23** | Transcript of JJ Justilian's deposition. |
| **Item #24** | Transcript of Richard Sebastian's deposition. |
| **Item #25** | Four (4) Photographs of Store #61 – Harrison County, MS; Three (3) Photographs of Store #63 – Brunswick, GA and Three (3) Photographs of Store #69 – Rockingham County, VA taken from Google Maps. |
| **Item #26** | Buc-ee's City of Crossville Store #50 Site Plans. |
| **Item #27** | Transcript of Brian Matthews' deposition. |
| **Item #28** | Transcript of Lisa Carrell's deposition. |

## Facts and Data Considered

**Item #1** contains a **First Photograph** close-up view of the wheel stop at Crossville (where Ms. Carrell tripped and fell) and a **Second Photograph** shows more of an area depiction of the area where Ms. Carrell fell.

    a.    The **First photograph** shows a distance measurement of 9.5 inches from the outside edge of the bollard to the centerline of the wheel stop where Mr. Carrell encountered a tripping hazard.

    b.    The **First Photograph** further shows the blue wheel stop where red and white strips have been added to the blue wheel stop.

    c.    The **Second Photograph** is more of a perpendicular or 90-degree view from the direction of Ms. Carrell's walkway as she walked from right to left as she exited Buc-ee's Store #50 and walked towards the gasoline pumps on the left. The door

4

she exited is to the right in this photo. Bollards, wheel stops and blue striping are in the center of the photograph. Ms. Carrell was walking right to left at the time of her unfortunate fall.

**Item #2** Dropbox link shows Civil Engineering Kimley-Horn Store Plans for Calhoun, GA (ones presented in the earlier Full case) and Store Plans for Colorado store.

    a.    The **Item #3** Dropbox link presents 566 pages of store plans produced in Defendants' Supplemental Response to Plaintiff's First Set of Requests for Production of Documents #8 and list of design firms, general contractors and civil engineers.

    b.    This massive number of plans showed that there are lots of similarities and uniformity in the design of Buc-ee's stores across the country.

    c.    These 566 pages did reveal that absolute uniformity is not present.

    d.    Finally, differing companies have performed various design and construction aspects for numerous Buc-ee's stores. (i.e., Two (2) Final Sheets summarize the 1) Design Firm, 2) Civil Engineering Firm, and 3) General Contractor for each Store #42-47 and Store #51-58 for a total of 12 Stores.)

**Item #3** was a Dropbox link with 566 pages of store plans produced in Defendants' Supplemental Response to Plaintiff's First Set of Requests for Production of Documents #8 and list of design firms, general contractors and civil engineers.

**Item #4** contains Two Depositions of Rule 26 Expert Report in an earlier Calhoun, GA case reveal:

    a.    Deposition of Plaintiff's Rule 26 Expert Report – Brani – Calhoun, GA case.

        1.    Dr. David M. Brandi, Ph.D., P.E. and Principal Engineer for David Brandi Engineering, LLC prepared a Rule 26 Expert Report dated June 6, 2024, in the Teresa Full v. Buc-ee's Georgia LLC lawsuit involving Ms. Teresa Full's January 10, 2022 trip and fall in Adairsville, GA.

        2.    This report was for Patrick Matson, Esq. of Matson and Matson, PC located in Rome, GA 30165.

        3.    Dr. David Brandi's Background Information was presented on pp. 1-2.

        4.    Page 2 further presents supporting codes information from 1) National Fire Protection Association (NFPA), 2) International Code Council (ICC), 3) American Society for Testing of Materials (ASTM), and 4) Americans with Disabilities Act (ADA).

        5.    His "Basis for Opinions and Methodology" were described on pp. 2-4.

5

6. Pages 4-12 produced Table 1 (detailing Ms. Full's fall via a Store video with Columns for Time Stamps, Plaintiff Activity, and an "Other" column detailing other observed activities on the video), and Figures 1-7 further describing details regarding Ms. Full's fall, wheel stop and bollard placement in this case, etc.

7. A significant finding of Dr. Brani was that in this case…the video clearly showed that customers did not always walk on identified walkway paths but often took varying paths as they returned to their parked vehicles in the store parking lot.

8. Dr. Brani offered Three (3) Expert Opinions on pages 12-21 which I will summarize as follows:

   i. **Opinion 1**-A bollard in front of Person with a Disability (PWD) designated parking space satisfies ADA standards for maintaining "adjacent accessible routes" for pedestrians without the accompanying use of a wheel stop. In other words, wheel stops are not mandatory.

   ii. **Opinion 2**-A measured distance of only 20.37" from the bollard to the centerline of wheel stop where Ms. Full fell was not adequate for preventing a parked vehicle's front overhang from still striking the bollard.

   iii. **Opinion 3**-The in-place wheel stop served no functional purpose and was not necessary.

9. Pages 22-23 supplied Dr. Brani's Data and Information Sources, Expert Witness Qualifications, and Compensation Information to conclude his Expert Report.

b. Deposition of Defendant's Rule 26 Expert Report – Lawson – Calhoun, GA case.

   1. The Buc-ee's Defense Attorney (David Forestner, Esq. of Jones Walker, LLP) hired Exponent, Inc.to prepare a Defendant's Rule 26 Report regarding Ms. Full's fall on January 10, 2022, at the Buc-ee's Store in Calhoun, GA.

   2. The Exponent report was dated July 3, 2024, and was prepared by Dr. Regan R. Lawson, Ph.D., Associate Safety Professor and Dr. Cliff D. Bishop, Ph.D., P.E.

   3. The Executive Summary listed "Code Compliance Findings" and "Human Factors Findings" as two major areas summarizing the two expert opinions.

6

4. The Code Compliance Findings were that 1) using both a wheel stop and a bollard is consistent with contract documents and does not violate required applicable existing ordinances, codes, and industry standards, and 2) the layout of Persons with Disabilities (PWD) stalls is consistent with required applicable ordinances, codes, and industry standards.

5. The Human Factors Finding reported that 1) a reasonably alert and attentive pedestrian should have recognized the presence and geometry of the incident wheel stop and safely navigated without falling, 2) the wheel stop was visually available, 3) personal intrinsic factors placed Ms. Full at an increased fall risk, and 4) that Dr. Brani presented incorrect human vision actions when walking, offered incomplete analyses of other contributing factors, offered opinions not supported by case materials and/or scientific literature so these opinions are irrelevant.

**Item #5** presents numerous Customer Personal Injury reports of falls FOR all stores from 12/3/23-10/20/25 (including Crossville) in Defendants' Response to Plaintiff's Third Set of Requests for Production of Documents #1 and #3 with list of falls by store.

a. This Item #5 contained two files entitled 1) "Lists of all store falls" and 2) BUC_ CARRELL001030-1889.

b. The first file chronicled the number of wheel stop related falls at 15 stores from December 3, 2023 to October 20, 2025. These 15 Buc-ee's Stores had a total of 439 wheel stop falls over this ~23.5-month period.

c. The second file contains 860 pages of the corresponding "Customer Personal Injury" reports.

**Item #6** presents the Customer Personal Injury reports for Store #50 – Crossville, TN prior to 12/2/23 produced in Defendants' Response to Plaintiff's First Set of Requests for Production of Documents #1 with list of falls.

a. The data in Item #6 revealed that there were sixty (60) earlier wheel stop trip incidents at Store #60 in Crossville, TN prior to Ms. Carrell's fall on December 2, 2023.

b. Four reported factors in each of sixty (60) reported trip and fall incidents included the following:
Stamped:
Name:
Incident Date and Time:
Incident ID:

7

**Item #7** contains 196 Customer Personal Injury reports of all store falls prior to 12/2/23 (except Crossville) in Defendants' Supplemental Response to Plaintiff's First Set of Requests for Production of Documents #3 with subfolders for each store's falls and list of falls by store.

     a.     Like the information presented earlier in Item #5, Item #7 contained two files per store entitled 1) "Lists of all store falls" and 2) all corresponding Customer Personal Injury Reports for each incident for that store. **(e.g., BUC_ CARRELL000493-BUC_CARRELL000867.)**

     b.     The first file chronicled the number of wheel stop related falls at 11 stores prior to Ms. Carrell's fall on December 2, 2023. These 11 Buc-ee's Stores had a total of 196 different wheel stop falls BEFORE Ms. Carrell's fall on December 2, 2023.

**Item #8** has Exhibits 6-18 from Richard Sebastian's deposition (These are photographs of other stores)

**Item #9** Video of Lisa Carrell's Fall, Lisa Carrell's Customer Personal Injury report and Lisa Carrell's Customer Statement & Information form.

     a.     The **video** of her fall revealed no cell phone use or other obvious distractions as she walked to her vehicle in the parking lot with her granddaughter.

     b.     The **Customer Personal Injury Form** revealed information such as:
          1.     Store #50
          2.     Tire Stop was involved.
          3.     Date and time of Ms. Carrell's fall was 12/2/2023 @ 5:38 p.m.
          4.     Incident ID is PI50120223-1738.
          5.     Weather Condition was "Rainy".
          6.     Descriptions of Ms. Carrell clothing and shoes at the time of her fall.
          7.     Information regarding her injuries to face, fingers, and hand.
          8.     Reported Customer Statement was "She did not see the tire stop and fell to the ground."
          9.     Two (2) Employee Witnesses were Timothy Laios and Jackie Blankenship.
          10.     Laura McConnell was the Store General Manager.
          11.     J.J. Justilian was the Claims Reviewer.

     c.     The **Customer Statement & Information Form** was:
          1.     Form was handwritten by Ms. Carrell.
          2.     She exited from the door facing the gasoline pumps.
          3.     Her walking path was on the left side of the walkway.
          4.     Ms. Carrell's family transported her to the ER after her fall.
          5.     Details of her injuries and medical treatment.
          6.     Her insurance denied her ER expenses.
          7.     Ms. Carrell requested that Buc-ee's pay her ER expenses.
          8.     The date of the completed form was 12-28-23.

8

**Item #10** contains Videos of other Crossville falls at **Store #50 prior** to December 2, 2023, produced in Defendants' Response to Plaintiff's Second Set of Requests for Production of Documents #1.

a.   Sixty (60) pedestrian falls were reported to have occurred before December 2, 2023, the date when Ms. Carrell fell.

b.   Fifty-eight (58) videos of these sixty (60) pedestrian falls were provided.

**Item #11** Not replied upon.

**Item #12** Not replied upon.

**Item #13** Exhibit 4 of Dale Fitzpatrick's deposition (photographs of Crossville store).

a.   This **Item #13** provided eighteen (18) photos of the Crossville store from varying locations and angles as follows:

**Photo/Sheet**
1.   Cover Sheet stating that the accompanying photographs are Crossville Store Front and Side Views.
2.   Four (4) inch height of blue wheel stop with added red and white tape.
3.   Distance from sign bollard to centerline of wheel stop is only 7.5".
4.   Like No. 2 earlier but this photograph shows more of a close-up photograph shows loosened red tape on the blue bollard.
5.   Doorway, grooved pavement, and blue stripes on pavement to the right.
6.   Parked vehicle hiding most of the view of a wheel stop on the left. This would be the sight lines for pedestrians walking toward the store.
7.   Photograph depicts a brick column to the left and a sloped grooved pavement.  The sloped vertical face is not painted to warn pedestrians of the trip and fall hazard.
8.   Shows similar conditions to No. 7.
9.   Shows 5 "Persons with Disabilities" (PWD) parking spaces.
10.  Store, grooved pavement, and fuel pumps are shown.
11.  This photo demonstrates the "I-Shaped" ingress/egress pattern of the building on the side with the fuel pumps. (The two (2) doors are represented by the top and bottom horizontal bars of the "I". Pedestrians would enter a left or right door.  When exiting they would pass through the door at the top or bottom of the "I".
12.  Somewhat like earlier No. 8 and 9 photographs.
13.  Similar view to No. 12 but viewed from a different angle.
14.  This is a very illustrative photograph that shows how very close the bollard signpost is to the wheel stop.
15.  This photograph is more of a panoramic view of five (5) PWD parking spaces again showing how close the bollard and wheel stop are to each other.

9

16. This is like No. 15 but shows six (6) PWD parking spaces.
17. A red and white metal plaque has been attached to a blue bollard signpost.
18. This photograph shows the Buc-ee's logo on the building face over the 2045 address.

**Item #14** Photographs of wheel stop Carrell fell over (circled) and additional photographs of Crossville store.

    a.     This item has two files with a total of four (4) photographs.

    b.     The first file has three (3) photographs like other photographs that are looking from the fuel pumps towards the store.

    c.     The second file shows one photograph with the wheel stop circled where Ms. Carrell tripped and fell.

**Item #15** Exhibits 1, 3, and 4 to Wesley Harness' deposition (pictures of store #50 – Crossville, TN).

    a.     Exhibit 1 shows five (5) blue bollards with two (2) to the left and three (3) to the right.

    b.     Exhibit 3 shows 2 signs on bollards, blue stripping, and blue and white wheel stops.

    c.     Exhibit 4 shows a blue bollard with red and white tape added. This exhibit shows that some of the blue paint was showing wear.

**Item #16** shows Exhibit 4 to Richard Sebastian's deposition (a portion of store #50 – Crossville, TN site plans from Defendants' responses to Plaintiff's First Set of Requests for Production of Documents #7)

    a.     This item has four (4) pages.

    b.     These four (4) pages showed a cover page for Store #50 and three (3) pages from Store #50 Site Plans.

    c.     The three (3) Site Plan pages are A0.3, A03.B, and A0.3D.

**Item #17** has Exhibit 5 to Richard Sebastian's deposition – (collective) a portion of Store #42 (Baldwin, AL); #43 (Leeds, AL); #46 (St. Johns County, FL); #47 (Daytona Beach, FL); #51 (Warner Robins, GA); #52 (Calhoun, GA); #53 (Florence, SC); #55 (Richmond, KY) site plans from Defendants' supplemental responses to Plaintiff's First Set of Requests for Production of Documents #8.

    a.     This Exhibit has thirty (30) pages.

10

b. These pages typically consist of one cover page and typically 3-4 additional pages for eight (8) different stores that show pages from each stores Site Plans.

**Item #18** Transcript of Ashley McGeorge's deposition.

a. p. 10 – AGM
b. p. 15 – Does not know if tire stops were required.
c. p. 16-22 – She's done Customer Personal Injury (CPI) reports for fingers pinched in doors, slips on something like a wet spot inside the store, customers striking pegs on walls that hold products.
d. p. 22 – Trips over tire stops are all over the same object. As a % of the reports, trips over tire stops constituted the largest injury by a single object she reported as customer personal injury.
e. p. 25-26 – Video of fall is downloaded for report.
f. Ms. McGeorge wrote 9 Customer Personal Injury reports for tire stops between July 21, 2022 to December 2, 2023. Exhibit 1 to her deposition.
g. p. 35 – Risk of serious injury
h. p. 38 – She has seen customers trip and fall over wheel stops.
i. p. 39 – Wheel stops were solid blue when store opened.
j. p. 39-45 – She recalls that local AGMs and GMs decided to add reflective red and white tape. Tried to make it more safe. Tried tape to make it seen more.
k. p. 42 – Based on customer statements, she knew customers were not seeing the tire stops.
l. p. 42 – Based on statements of customers in incident reports it was clear to her that a lot of people were telling us they didn't see the wheel stop.
m. p. 43 – She admitted putting tape on tire stops did not stop people from falling.
n. p. 43 – People kept falling.
o. p. 43 – Does not know if wheel stops were required.
p. p. 44 – There was no discussion about removing tire stops, no discussion about painting tire stops a different color.
q. p. 44 – She realized there needed to be something safer in place.
r. p. 47 – She never heard of a report of injury caused by a bollard.
s. p. 50 – She believed Dale Fitzpatrick, at corporate, was responsible for safety.
t. p. 52 – she did a safety audit walk with him. No conversation about tire stops.
u. pg. 54 – Dale Fitzpatrick is the face of safety.

**Item #19** Transcript of Laura McConnell's deposition (AGM at Crossville for ~2 years).

a. p. 8-9 – Deposition of video and how people walk.

Case 2:24-cv-00080    Document 94-1    Filed 05/29/26    Page 11 of 49 PageID #: 1165

b. p. 10-12 – 120 gas pumps at Buc-ee's Crossville, two lanes of traffic, constant traffic driving through parking lot, customers constantly pulling into and out of parking spot. Customers have to watch traffic, might get hit by car.

c. p. 20–23 – Safety training

d. p. 25–28 – SOP for safety

e. p. 49-54 – She wrote CPI reports that people said they didn't see tire stops. She doesn't remember if she ever talked to management about the number of people injured on tire stops. She couldn't state an acceptable percentage of people to fall over tire stops. She didn't think Crossville had a lot of falls. She wrote 23 reports.

f. p. 60-63 – Doesn't remember who made the decision to add red and white tape. She claims she personally ordered the tape. She said the reason was to make the tire stop more visible for cars pulling in, then said she didn't know why wheel stops needed to be more visible for cars pulling in. Asked if based on her personal experience in writing up 23 reports of falls, if it was a good idea to make the tire stops visible and she said yes.

g. p. 63 – She does not remember anyone being injured by a bollard. She couldn't think of any other location in the store where she wrote 23 customer personal injury reports.

h. p. 71-72 – She personally tripped and fell over tire stops twice. Once in Leeds, AL and once in Crossville, TN. In Leeds, she was on her cell phone. At Crossville, she was running to catch a customer that did not pay.

i. p. 75 – She said she doesn't know who made decision to add red and white tape, thinks it was local.

j. p. 75 – 76 – reason for tape.


**Item #20** Transcript of Timothy Laios' deposition.

a. p. 23-28 – Training for customer safety. Detailed instruction on spills and wet weather to prevent customer injury. Training to report injuries.

b. p. 28 – Could not recall any other training geared toward customer safety.

c. p. 30 – Dale Fitzpatrick of Health & Safety was the only person at the corporate level that was responsible for safety issues at the Crossville store.

d. p. 30-34 – Dale Fitzpatrick never talked to him about customer safety. Dale Fitzpatrick was only person at corporate with responsibility for safety.

e. p. 45 – Referenced to people being seriously hurt.

f. p. 56 – Cameras prove the people fell on wheel stops.

g. p. 59 – Customer claim cards given on request.

h. p. 63 – He's seen customers bleeding and cut after falls.

i. p. 67-69 – Fall on 7/30/25 (deposition date) went to hospital.

j. p. 74-77 – He said he was not involved in decision to add red and white tape. People continued to fall after tape was added. Customers said they didn't see the wheel stops before the tape was added. Customers continued to say they did not see tire stops after the tape was added.

12

k.    p. 78-83 – After asked about all the ways people can be injured, he could not think of any other single object that caused as many injuries as tire stops.

l.    p. 86 - Asked how many trip and falls are too many. Answer one is too many.

m.    p. 86 – Why the tire stops haven't been removed? I don't know the answer.

n.    p. 86 – Try another color? I don't know the answer.

o.    p. 88 – He would like people to quit falling over tire stops.

p.    p. 89 – He doesn't know if wheel stops have to be there.

q.    p. 89 – He's never written a report for anyone being injured by a bollard.

r.    p. 92-93 – There are no signs saying "Walk Here" or "Don't Walk Here"

s.    p. 93 – There are no signs prohibiting walking through handicapped parking spots.

t.    p. 93 – From experience, he knows customers walk through empty handicapped parking spots

**Item #21** Transcript of Wesley Harness' deposition.

a.    p. 10-13 – He misstates what video shows.

b.    p. 17-20 – size of travel centers, location of handicap parking spaces, world's largest convenience store.

c.    p. 37 – He agreed if people fall to concrete or asphalt there is a risk of serious injury or death.

d.    p. 37 – He agreed Buc-ee's has a duty to use reasonable care to prevent people from falling.

e.    p. 37-48 – Red and white tape was added to make the store safer for guests. Does not remember dates.

f.    p. 41 – Bollards in Handicapped Parking Spaces were never damaged while he was GM.

g.    p. 41 – He could not recall how decision to add red and white tape was made.

h.    p. 41 – He could not remember if he asked for approval, doesn't know when it was added, does know original tape would come off and have to be replaced, doesn't recall whose idea it was to add tape.

i.    p. 43 – Doesn't know who came up with idea.

j.    p. 44 – Dale Fitzpatrick is designated as risk manager at corporate.

k.    p. 44-45 – Dale Fitzpatrick came to store, but Harness never talked to Fitzpatrick about people tripping and falling on wheel stops.

l.    p. 48 – He doesn't know if anyone at corporate was keeping up with the number of falls over tire stops.

m.    p. 48-49 – He doesn't recall any conversation at corporate or local store employees about a problem with people tripping over tire stops.

n.    p. 53 – Does not know if tire stop was necessary in this location.

o.    p. 54 – He admits that customers routinely walk through empty parking spots.

p.    p. 54 – There are no "Walk Here Only" sign in any area.

13

| q. | p. 55 – He wouldn't say anything to a customer that walked through an empty parking spot. |
|---|---|
| r. | p. 55 – He knew customers walked through empty parking spots. |
| s. | p. 55-56 – In Crossville there are two lanes of traffic between front and gas islands. |
| t. | p. 57 – There are 120 gas pumps located at front of store. |
| u. | p. 59 – Various corporate management has inspected the property. Never talked about wheel stops. |
| v. | p. 60-63 – various ways people get hurt. |
| w. | p. 69-70 – video of falls shows location. |
| x. | p. 75 – customer struck head on rock, brick column. |
| y. | p. 76-78 – He completed a CPI report May 9, 2023 for Mark Wagner. Customer said that thing shouldn't be there. |
| z. | p. 77 – Harness did nothing about customer comment. |
| aa. | p. 78 – Said it was up to claims department. |
| bb. | p. 79 – Said most likely a decision to remove wheel stop would have been up to Dale Fitzpatrick. |
| cc. | p. 80-81 – He has no idea the number of falls on wheel stops from store opening to December 2, 2023. |
| dd. | p. 82 – The first CPI report was June 27, 2022, the day the store opened. |
| ee. | p. 83 – Asked if he was counting, wouldn't there be enough falls to say "these are too many". He said he didn't have enough information to make that kind of decision. |
| ff. | p. 83 – Once they entered an incident report they have no more connection to the report. |
| gg. | p. 87 – Asked what is an acceptable percentage of people to fall over a wheel stop before the wheel stop should be removed, and he said he has "no idea". |
| hh. | p. 88 – He never took a report of anyone injured by a bollard. |
| ii. | p. 94-95 – He acknowledged many distractions for customers walking through parking lot. Examples, customers with small children, mobility impaired, looking for their car, watching for traffic, moving cars, items on display for sale. |
| jj. | p. 95 – He knows people walk through parking spaces. |
| kk. | p. 96 – Removing wheel stops is not his decision. |
| ll. | p. 97 – He doesn't know who is responsible for deciding whether wheel stops are a trip hazard. |
| mm. | p. 99 – Claims Department would know exactly where incidents happen by watching videos. |
| nn. | p. 105 – There is no standard operating procedure to prevent people from tripping over tire stops. |

**Item #22** Transcript of Dale Fitzpatrick's deposition.

| a. | p. 8 – His only preparation for the deposition was to talk to inside counsel and outside counsel to refresh his memory of the facts he would be called to testify. |

14

b. p. 8 – He only read the notice of deposition.
c. p. 8 – He did nothing to learn corporate knowledge of the requested items.
d. p. 9 and 12 – At the time of his deposition, he had been to the Crossville store an estimated three or four times.
e. p. 10 – He never spoke to any of the people in management at the Crossville store about wheel stops or injuries at wheel stops.
f. p. 11 – He had no conversations about that subject.
g. p. 11 – Employee injuries were the main focus of his visits.
h. p. 12-13 – In order to prepare himself to testify about the 30(b)(6) topics of inquiry, he is relying on his personal knowledge of those topics.
i. p. 12-13 – The conversations with the in-house and outside counsel were the only things he did in preparation for the deposition.
j. p. 13 – He's been the Health and Safety Manager since August 2020.
k. p. 16 – He is a one man department.
l. p. 16 – His responsibilities include employee safety at all Buc-ee's retail stores and corporate offices.
m. p. 16 – His responsibility also included handling customer incidents as needed with the legal and claims team, more so with legal.
n. p. 18 – Legal would consult with him and bring him to investigate and try to come up with a response to the issue that's causing any of the incidents.
o. p. 18 – Prior to 30(b)(6) notice legal had not contacted him on Lisa Carrell's claim.
p. p. 19 – He denied being involved in any personal injury claims of any kind at Crossville.
q. p. 21 – He never received any reports regarding trip and falls on the wheel stops at the Crossville store.
r. p. 22-23 – He did recall receiving a phone call about the red and white tape on the wheel stops coming off.
s. p. 23 – He doesn't recall which specific store it was.
t. p. 23 – He found the aluminum plate with red and white tape to use as an alternative to using the tape on tire stop.
u. p. 24 – He was looking for a more durable alternative.
v. p. 27 – He did have knowledge of customer trip and falls over tire stops at stores.
w. p. 27 – There were potentially some customers that were tripping over wheel stops as they were exiting the building.
x. p. 27 – During his three or four inspections at the store in Crossville, he never recognized the tire stops as a potential trip hazard to customers.
y. p. 27-28 – He can't recall the date he learned about customers falling over wheel stops.
z. pg. 29 - He was not involved in the decision to add red and white tape.
aa. p. 33 – He had never seen the customer personal injury reports for falls that occurred prior to Lisa Carrell's fall.
bb. p. 37 – He knows when the store in Crossville opened, there was no red and white tape on the tire stops.

15

| cc. | p. 37 – He knows red and white tape was added to the tire stops at Crossville but didn't have specific knowledge of the exact date that occurred. |
| dd. | p. 37 – The general manager reached out to legal due to customer trip and falls over tire stops. |
| ee. | p. 37-38 – The red and white tape was added due to customers tripping and falling over tire stops. |
| ff. | p. 38 – He testified the general manager contacted legal regarding the tape. |
| gg. | p. 39 – The first store to put red and white tape on the tire stops was the Robertsdale, AL store. |
| hh. | p. 39 – The store manager in Alabama sought guidance from legal for application of the stick-on stickers at the parking tire stops. |
| ii. | p. 40 – Legal asked Dale Fitzpatrick how to come up with a more durable way of placing a visual, similar to the sticker, on the parking stops that was more durable and scalable on a company-wide basis. It became a company-wide standard. |
| jj. | p. 41 – Those metal plates have been applied to the handicapped parking stops at all of the stores. |
| kk. | p. 41 – The decision to add red and white tape at the Baldwin, AL (aka Robertsdale) store was made before Fitzpatrick was employed in 2020. |
| ll. | p. 41 – The general manager at the Robertsdale store asked legal for permission to add tape. |
| mm. | p. 42 – He did not remember the specific number of stores that would not have had tape, red and white tape on December 2, 2023. |
| nn. | p. 42 – He did not have a specific number of stores that were not having issues with customers tripping over tire stops. |
| oo. | p. 43 – He claimed that not all stores applied the sticker to their handicapped parking stops based on the fact that trip and falls were not an issue at their store. |
| pp. | p. 43 – He stated if a particular general manager noted an issue with trip and falls over tire stops, they were given guidance to put red and white tape on their wheel stops in the handicapped section. |
| qq. | p. 43 – That was never memorialized in writing. |
| rr. | p. 43 – The guidance by legal was related to store managers on a case-by-case basis. |
| ss. | p. 44 – To the best of his understanding, legal was giving the store general managers the advice to put the tape on. |
| tt. | p. 45 – On a case by case basis, the stores that asked for guidance from legal were told to apply the tape to the best of his knowledge. |
| uu. | p. 48 – He didn't know which stores applied tape. It was on an as needed basis. |
| vv. | p. 48 – He doesn't know the number of trip and falls that occurred after tape was added. |
| ww. | p. 48 – He hasn't done a study to see if red and white tape was effective in reducing the number of injuries. |
| xx. | p. 54 – To the best of his knowledge, he's never talked to J.J. Justilian about reports of customers tripping and falling over wheel stops. |

16

yy.    p. 50 – He doesn't recall ever having any conversations with J.J. Justilian on this subject.

zz.    p. 55 – He has not had any conversations with Richard Sebastian about customer trip and fall injuries on wheel stops.

aaa.    p. 55 – He restated that it was not a part of the routine to add the red and white tape unless it was specifically requested by the store's general manager.

bbb.    p. 57 – Mr. Fitzpatrick testified that red and white tape was added when there was a problem.

ccc.    p. 57 – Mr. Fitzpatrick testified every store that applied red and white tape applied the tape because there was an issue of customers tripping and falling over the wheel stops.

ddd.    p. 59 – If a store was noticing that trip and falls over wheel stops were occurring, the general manager would seek guidance from legal.

eee.    p. 59 – He stated that every store that had red and white tape on the wheel stop would be a store that had problems with people tripping and falling.

fff.    p. 60 – He believed that tire stops and sign markings are required under ADA code, but he had no expertise on the subject.

ggg.    p. 60 – He denied that the concrete-filled steel tube holding the handicapped parking sign at the Crossville store was intended as a bollard. He described it as an aluminum pole.

hhh.    p. 62 – He stated that the primary function of the wheel stops at the Crossville store was to prevent customers from driving into the front glass entry way of the store.

iii.    p. 63 – In order to remove the wheel stops, Mr. Fitzpatrick said a determination would need to be made on whether or not they were necessary and a risk assessment would have to be done before they could be removed.

jjj.    p. 63 – He would be the person that would do a risk assessment in coordination with the legal department.

kkk.    p. 68 – He did not know if a bollard alone would suffice to meet code requirements in Crossville, Tennessee.

lll.    p. 69 – He believed that Buc-ee's could not attach the handicap parking sign to a bollard.

mmm.    p. 71 – He admitted that he had general knowledge that people were still tripping and falling over wheel stops after the tape and the metal reflector were applied.

nnn.    p. 71 – It is his job to proactively discover problems that affect customer safety.

ooo.    p. 72 – No other efforts had been made to mitigate the hazards of trip and falls over wheel stops since adding the aluminum plates.

ppp.    p. 72 – He repeated a second time that the parking stops were what Buc-ee's wanted to use to prevent people from driving through the front of the store.

qqq.    p. 73 – He admitted wheel stops were in place not because they were required on a statutory basis but because the company was requiring wheel stops to prevent vehicles from driving into the store.

17

rrr.    p. 73 – He admitted the wheel stops were there because Buc-ee's wanted them to be there to prevent vehicle encroachment or driving through the front plate glass of the store.

sss.    p. 73 – He had never investigated whether bollards could be placed in these locations, so there would be no need for the wheel stops to be there.

ttt.    p. 74 – He's never considered the possibility of using a bollard and eliminating the wheel stop if that's permitted.

uuu.    p. 75 – He stated, based on experience, that it's a potential that people will continue to trip and fall over the wheel stops.

vvv.    p. 76 – He did not know how many customer personal injury reports Buc-ee's had given plaintiff for falls that occurred after December 2, 2023.

www.    p. 76 – He did not know the date of the most recent fall.

xxx.    p. 76 – He did not know whether falls had been reported within the last month.

yyy.    p. 76 – He claimed he could not quantify whether trip and falls over wheel stops were likely to continue.

zzz.    p. 77 – He was not aware there were more than 400 falls.

aaaa.    p. 78 – He admitted there was no signs prohibiting against customers walking through accessible parking space.

bbbb.    p. 78 – He admitted there were many circumstances that would cause a customer to cut through a parking space.

cccc.    p. 78 – He had never watched a video of any fall.

dddd.    p. 79 – He was not aware of any study of the videos to see whether any of the factors he was describing caused people's fall.

eeee.    p. 79 – He admitted that an engineer would be the person that could tell Buc-ee's whether bollards alone would suffice to offer protection to the front of the store.

ffff.    p. 80 – When asked if in order to leave wheel stops in place, Buc-ee's was willing to accept a certain number of falls, he responded that Buc-ee's does not want to see its customers injured at all.

gggg.    p. 82 – He testified Buc-ee's refused to remove the wheel stops because they protect the front of the store.

hhhh.    p. 82 – The information regarding the number of falls was in the control of Buc-ee's.

iiii.    p. 83 – They'd never shared that information with him.

jjjj.    p. 83 – He did not have any idea of the percentage of falls that resulted in injuries.

kkkk.    p. 83 – He couldn't qualify the risk/reward assessment to keep the wheel stops because he didn't know the number of falls that had occurred while tripping over a wheel stop.

llll.    p. 84 – He stated in regards to an acceptable percentage of injuries that Buc-ee's would accept to maintain the status quo, Buc-ee's didn't want to see any customers injured and he couldn't quantify that with a specific answer because they don't want to see customers injured.

**Item #23** Transcript of JJ Justilian's deposition.

a. p. 9 – Ms. Justilian is the claims manager.
b. p. 13 – 14 – She did nothing to prepare for role as 30(b)(6) witness.
c. p. 17 – She thought customer safety was a part of what Dale Fitzpatrick's job included.
d. p. 17 and 19 – She did not know exactly what Dale Fitzpatrick does.
e. p. 19-20 – She never had any interaction with Dale Fitzpatrick addressing customer safety issues.
f. p. 20 – She usually hears from him after a decision has been made about something that is going to be done.
g. p. 20 – He told her after they put red and white stripes on the blue wheel stops.
h. p. 21 – She was not involved in decision, doesn't know who made decision.
i. p. 21 – She didn't suggest wheel stops be made more visible.
j. p. 22 – She thought Richard Sebastian and Dale Fitzpatrick would make decision to install red and white tape to wheel stops.
k. p. 26-27/p. 81-82 – When claims department employees were reviewing customer personal injury reports, they would look at the videos.
l. p. 40 – No one at Buc-ee's was counting the number of trip and falls.
m. p. 44 – She had no idea how many Customer Personal Injury forms regarding wheel stops were produced between January 1, 2019 and March 2022.
n. p. 44 – Ms. Justilian did not know how many Customer Personal Injury reports were submitted for trip and falls over wheel stops had been deleted subject to Buc-ee's retention policy.
o. pg. 49-50 – When reports came to the claims office, the people in claims checked the cameras to make sure that these were trip and falls over tire stops.
p. p. 58 – Ms. Justilian did not know whether anyone at Buc-ee's was tracking claims to try to identify particular areas that might be improved and made more safe.
q. p. 58 – She thought maybe the safety department.
r. p. 68 – She didn't know whether a wheel stop was required.
s. p. 68 – She doesn't know if anyone at Buc-ee's ever looked into the possibility of removing wheel stops.
t. p. 69 – She never realized the # of trip and falls over wheel stops.
u. p. 70 – JJ Justilian reviewed multiple Customer Personal Injury reports involving personal injuries at the Crossville store marked as Exhibit 4 to her deposition.
v. p. 88 – Ms. Justilian did not know what would be an acceptable number of people to fall.
w. p. 88-89 – She didn't know the acceptable number of falls.
x. p. 90 – She doesn't know if wheel stops are required.

| y.  | p. 95 – She doesn't know if there was ever any consideration given to changing the color of the wheel stop to yellow. |
| z.  | p. 95 – She said that would be safety and management. |
| aa. | p. 97 – Ms. Justilian admitted that as of the date of her deposition that people were still falling over wheel stops. |
| bb. | p. 99 – Ms. Justilian said that it was not handled in her department to use the records of falls to identify and solve the problem. |
| cc. | p. 100 – The red and white stripes did not stop the falls. |
| dd. | p. 104 – She had no suggestions how to stop wheel stop injuries. |

**Item #24** Transcript of Richard Sebastian's deposition.

| a. | p. 8 – Richard Sebastian is senior director of operations for all 56 Buc-ee's stores. |
| b. | p. 10 – Dale Fitzpatrick is responsible for safety at the stores. |
| c. | p. 12 – Mr. Sebastian is responsible for all day to day operations of all the stores. |
| d. | p. 13 – Mr. Sebastian has personally visited the Crossville store half a dozen times. |
| e. | p. 14 – He would stay for approximately 2 hours at a time. |
| f. | p. 17-18 – He did not review any documents or do any particular preparation for the 30(b)(6) deposition. |
| g. | p. 18 – He testified relying strictly on his personal knowledge to answer the questions. |
| h. | p. 20-28 – Customer traffic details |
| i. | p. 32-39 – Mr. Sebastian looked at the sidewalk plans, stating that all of the travel centers outside the state of Texas have essentially the same arrangement of handicapped parking spaces located at entrance and exits to store, that they all have wheel stops in the same location, they all have handicapped parking signs and they all have ramps that lead up to the door entrance. |
| j. | p. 32-39 – The store entrances are vestibules with automatic doors and stores have either two or three entrances. |
| k. | p. 32-39 – They all enter and exit through a vestibule and they all have automatic doors. |
| l. | p. 43-45 – Exhibits 6 through 18 of the deposition of Richard Sebastian, photographs of stores. The parties stipulated their photos of the store entrance of the Buc-ee's location identified on the cover page. |
| m. | p. 43-45 – They show the location of handicapped parking spaces, the location of the wheel stops, and the location of parking signs. |
| n. | p. 43-45 – They accurately depict the location of the store entrance and the location of the handicapped parking spaces and depict the ramps to the store entrances. |
| o. | p. 45 – Mr. Sebastian stated there was nothing he recognized at the time of his deposition that he thought had been changed since December 3, 2023. |

<table>
<tbody>
<tr><td>p.</td><td>p. 45 – They fairly and accurately depict those things at the time the photos were taken.</td></tr>
<tr><td>q.</td><td>p. 48 – Richard Sebastian testified the decision to add red and white tape to the wheel stops at Buc-ee's in Crossville, Tennessee was made by the legal team.</td></tr>
<tr><td>r.</td><td>p. 48 – The decision to add red and white tape was store specific.</td></tr>
<tr><td>s.</td><td>p. 49 – He believed the first store to have red and white tape added was Store #42 in Baldwin, Alabama. Floyd, the general manager there, addressed legal about adding red and white tape.</td></tr>
<tr><td>t.</td><td>p. 50 – Thereafter, red and white tape was added to wheel stops on a store-by-store basis.</td></tr>
<tr><td>u.</td><td>p. 50 – He claimed not to know whether the tape was added in response to the number of falls they were experiencing at these locations.</td></tr>
<tr><td>v.</td><td>p. 50 – Said he wasn't sure why Floyd initiated the conversation.</td></tr>
<tr><td>w.</td><td>p. 52-55 – Richard Sebastian reviewed exhibits 4, 6 and 7, which were customer personal injury reports.</td></tr>
<tr><td>x.</td><td>p. 55 – Does not know if anyone on behalf of Buc-ee's ever analyze customer personal injury reports to see # of injuries and how serious.</td></tr>
<tr><td>y.</td><td>p. 56-60 – Mr. Sebastian identified records of seven trip and falls over wheel stops which occurred at the Calhoun Georgia store beginning August 24, 2021 as evidence that reports of customer personal injury were made prior to May 2022, the beginning dates of the customer personal injury reports furnished to Plaintiff.</td></tr>
<tr><td>z.</td><td>p. 66 – Mr. Sebastian does not know if wheel stops were required at the Crossville, TN store where Ms. Carrell fell.</td></tr>
<tr><td>aa.</td><td>p. 66 – He testified that he did not know whether anyone had ever been tasked with investigating how to reduce the number of falls at wheel stops at Buc-ee's.</td></tr>
<tr><td>bb.</td><td>p. 67 – Does not know if anyone has been tasked with investigating how to reduce the # of falls on wheel stops.</td></tr>
</tbody>
</table>

**Item #25** contains four (4) Photographs of Store #61 – Harrison County, MS; three (3) Photographs of Store #63 – Brunswick, GA and three (3) Photographs of Store #69 – Rockingham County, VA taken from Google Maps.

    a.    This Item has ten (10) photographs with views of Stores without wheel stops.

    b.    The photographs are from three (3) different stores.

    c.    The sixth photograph is an excellent, clear view of ~ seven (7) PWD parking spaces with blue bollards and signs at the Harrison County, MS Store.

**Item #26** consists of Buc-ee's City of Crossville Store #50 Site Plans A.00 through A0.4.

a. The full-size Crossville Store Plans were printed for me and consist of sixteen (16) pages.

b. Each sheet has an Original Sheet Name in the lower right corner.

c. For my own reference purposes, I have written sequential page numbers (i.e. 1-16) in the same lower right corner area.

d. On the page I labeled "16" which reads "A0.4-Site Plans", there is Detail 8 showing design measurements for Handicap Parking and the drawing shows that the design distance between the bollard sign and the wheel stop should be 2'11" for the Crossville Store.

**Item #27** Transcript of Brian Matthews' deposition.

a. p. 8 – He helped open the store.
b. p. 18 – He was promoted to maintenance manager in May 2023.
c. p. 20 – He was listed as a witness on 7 Customer Personal Injury reports of customers tripping and falling over wheel stops.
d. p. 22 – Red and white tape added. Somebody else's idea.
e. p. 25 – He stated the purpose of wheel stops in this location was to keep cars off the building.
f. p. 25 – None of his department told him they had tripped. No one said wheel stops should be a different color.
g. p. 41 – His department put the striped metal plate on all the wheel stops in March or April 2025.
h. p. 44 – He knew people walked through handicapped parking spots when the spots were vacant.
i. p. 44-45 – He stated if the most direct route for him was to walk through a vacant handicap parking spot, he walks through handicapped parking spots.
j. p. 45 – People are not required to stay within the cross-hatched area.
k. p. 45 – There are no signs telling people to only walk in the cross-hatch area.
l. p. 45 – He stated people are free to walk where they want.
m. p. 45-46 – He thought corporate safety department would collect information about the number of people tripping and falling.

**Item #28** Transcript of Lisa Carrell's deposition.

a. p. 6-21 – Background questions, personal history, family members
b. p. 23-26 – Employment history, present job
c. p. 28-33 – Deposition preparation, watch video, went to Crossville Bucee's.
d. p. 38-45 – Identifies witnesses personally known to Lisa.
e. p. 47-54 – Text messages with friend and husband.

22

f.   p. 55 – This is the only wheel stop Lisa Carrell has ever tripped over.
g.   p. 57-58 – Search of text messages.
h.   p. 59 – She's been to Buc-ee's in Crossville and a Buc-ee's in Georgia.
i.   p. 61-62 – Went to Buc-ee's to look at scene of fall in 2024. Measured wheel stop and took pictures.
j.   p. 63-66 – Stopped at Buc-ee's on way to Florida. Friends wanted to stop.
k.   p. 66-75 – On December 2, 2023, she was traveling with son, daughter-in-law, granddaughter, Aria Thorpe and Annalyn Vanatta. Going to Cherokee Caverns. Stopped to get presents. Were in the store probably an hour.
l.   p. 76 – Details of visit when Lisa Carrell fell. Stopped for gas. Lisa Carrell threw away trash. Took Aria into store and purchased two bags of Buc-ee's Nuggets and walked out the door. She looked to the right to see car, also looking for oncoming traffic to protect her granddaughter. They angled toward the car and started walking. It had been raining, after sunset. Wet and drizzling. She just turned corner, looked at car and headed towards car.
m.   p. 77 – Her foot caught the corner of the wheel stop and she fell forward. Aria, her granddaughter, helped her up. Fingers were bleeding everywhere. Her tendons were already showing out the back on her palm. Middle finger was dislocated.
n.   p. 78 – She was in shock, felt like she was going to faint. An employee was at the pump. She sat in car. Manager came. Sara gave information. They left to go to hospital. She was wearing her glasses.
o.   p. 80-83 – Shown Plan A0.2. Attorney asked her to identify. Asked her to mark fuel convoy to show where car was parked. Could not tell what fuel pump was marked (Exhibit 9).
p.   p. 84 – She entered via "crosswalk" area (shown on video).
q.   p. 85-89 – Had a bag when she left the store. She was following blue lines. Everything was blue. She was on right, Aria was on left. They were in blue crossed area. She was looking forward for oncoming traffic and for rain and to see where car was. They shifted a little to the right, mostly still in blue area to go towards car. People walk in cross hatched area, but it's also no parking.
r.   p. 89-90 – They walked through the hatched area. She was looking toward the car and oncoming traffic. She tripped over the wheel stop. She was not looking where her feet were going. Where she looks depends on where she is walking. Normally ahead for what might be a danger or problem. At Buc-ee's, she wasn't looking down because she didn't perceive any danger there. The place you entered and come out is all smooth concrete. There were no potholes. There was no ice or any reason for her to be looking down.
s.   p. 90 – She agreed wheel stops were a fixed object.
t.   p. 91-92 – She denied that if she'd looked down she'd seen the wheel stop. It's only a few steps outside the door. She might have seen it if she looked down at the right time. There was no car in parking space. No one was walking in front of her.

23

u.     p. 93-94 – She walked through the handicap parking spot because it was route to car. There was no impediment to using the hatched area.

v.     p. 95 – Buc-ee's asked if they needed assistant to son and daughter-in-law.

w.     p. 96-97 – There was a gas pump attendant, talked to son, he called manager. She doesn't recall saying anything. She was in a hurry to get to ER.

x.     p. 98 – Went to Crossville ER, then son took her home.

y.     p. 99 – ID'd wheel stop Ms. Carrell fell over (Exhibit 10).

z.     p. 100 – It's similar to other wheel stops she has seen.

aa.     p. 101 – Customer Personal Injury report (Exhibit 11).

bb.     p. 102 – She doesn't recall saying anything.

cc.     p. 103-107 – Customer Statement & Information, she wrote it (Exhibit 12).

dd.     p. 108-110 – Photographs. She took picture with tape measure. Attorney may have taken the others (Exhibit 13).

ee.     p. 111-114 – Details of ER visit and treatment.

ff.     p. 115-117 – Appointment with Dr. Rubright, hand surgeon and treatment.

gg.     p. 120-122 – Medical expenses $38,181.42.

hh.     p. 122-125 – General questions about medical expenses.

ii.     p. 126-130 – Details of loss of function and impairment in hand.

jj.     p. 133-134 – Questions on social media posts.

kk.     p. 135-138 – Questions about hobbies, cooking, typing.

ll.     p. 139 – Questions about allegations in complaint regarding wheel stop not required.

mm.     p. 139 – Buc-ee's should be responsible because it wasn't necessary and if it was not there she would not have been injured. She feels bad for all the people that fell before she fell and since she fell. There's no reason for anyone to get hurt if they'd just remove them.

nn.     p. 141-142 – She's done interest research that wheel stops are a known trip hazard.

oo.     p. 143 – She said she probably bears some fault because she didn't see it but she had no reason to be looking for it and when she entered the store the path was clear.

pp.     p. 143 – She was trying to protect grandchild from traffic and looking for where her car was. I was just not looking down. I did not see it.

qq.     p. 144 – Buc-ee's has a marked area but people walked everywhere. There's no sign to only walk in that spot.

rr.     p. 145 – Buc-ee's should remove wheel stop.

ss.     p. 146-149 – Follow up questions on medical expenses, medical records.

tt.     p. 149-157 – Watched video of fall.

**Expert Statements and Opinions**

24

**Expert Statements:**

A long-standing treatise that I taught at Vanderbilt for many, many years is the "Design Trinity". A summary of the three principles of the "Design Trinity" are as follows:

1.  **IF** there is a dangerous and unsafe hazard, **REMOVE IT**.
2.  **IF** the dangerous and unsafe hazard cannot be removed, **PROTECT** against the dangerous hazard.
3.  **IF REMOVAL** or **PROTECTION** from the dangerous and unsafe hazard cannot be accomplished, **ADD A WARNING** as a minimum.

## <u>Expert Opinion 1</u> – The wheel stops in the accessible parking spaces at the Buc-ee's in Crosville were not required.

Page A0.1 of the plans provided by Buc-ee's show the design was required to comply with the 2010 ADA *"Standards for Accessible Design" (ADA Standards).* The ADA 2010 "Standard for Accessible Design" did not require a wheel stop in the Accessible Parking spaces at the Buc-ee's store in Crossville, Tennessee. The pertinent rule, 502.7, states as follows:

> **502.7 Relationship to Accessible Routes**. Parking *spaces* and access aisles shall be designed so that cars and vans, when parked, cannot obstruct the required clear width of adjacent *accessible* routes.

The standard does not mandate or require a specific design to comply with the standard. The advisory to 502.7 states wheel stops are one method to prevent vehicle overhangs from reducing the clear width of accessible routes. At the Crossville store, the bollard prevented vehicle overhangs from reducing the clear width of the accessible route as required by the ADA standard.

25



As shown in the photo above of the Crossville Buc-ee's, bollards prevented vehicles from encroaching on the required clear width of the accessible route behind the parking spaces. The wheel stops could have been removed and the bollards would be ADA Standard 502.7 compliant.

The *Guide to the ADA Standards,* published by the U.S. Access Board, provide guidelines to understanding the ADA Standards. *The Guide to the ADA Standards* "Accessible Routes and Accessible Aisles" shows the following illustration of a compliant accessible parking space with a sign and no wheel stop.

26



**Expert Opinion 2** – **The wheel stop in the Buc-ee's in Crossville should have been removed because the existing bollard was a safer alternative to the wheel stop.**

Generally, the use of wheel stops in parking lots should be avoided and limited to applications where the wheel stop is protecting something that cannot be feasibly protected by other means.

ASTM International is a global organization that develops and publishes voluntary technical standards. Since 1995, ASTM standards have specifically addressed wheel stops. ASTM *Standard Practices for Safe Walking Surfaces*, 1995 edition ASTM F1637-95 states:

8.1 Parking lots should be designed to avoid the use of wheel stops.

While ASTM Standards are not a codes requirement, their standards are clearly relevant and applicable to the negligence of Buc-ee's regarding the hazards presented by the use of wheel stops at this location.

All of the standards regarding wheel stops have continued to be published in the ASTM Guides. The most current edition, ASTM F1637-21, has the same provisions regarding wheel stops.

27

The ASTM Guides recommend bollards as an alternative to wheel stops. ASTM F1637-95, Section 8.7, states as follows:

> 8.7. Bollards, not less than 3 feet, 6 inches (1.07 m) height, may be placed in the center of parking stalls as an alternative to wheel stops. Bollards should be appropriately marked to enhance visibility in accordance with ANSI-2535.1.

The use of bollards is recommended in the Institute of Transportation Engineers *Traffic Engineering Handbook,* 7th edition published in 2016 (Traffic Handbook). Page 483 of this handbook, states as follows:

> *Excerpt (page 483): Certain design guidelines such as the 2010 ADA Standards specifically recommend wheel stops, primarily to ensure that overhangs do not encroach on pedestrian routes. Bollards, consisting of concrete-filled steel pipes painted traffic yellow, are often the better solution; the required sign for an accessible stall can be buried in the bollard.*

When Buc-ee's in Crossville opened, each accessible parking space had a bollard in the center of the parking stall, and a wheel stop in front of the bollard. Dale Fitzpatrick, the safety manager for all retail stores, was deposed on December 17, 2025. He testified the primary function of the wheel stops at the Crossville store was to prevent customers from driving into the front glass entryway of the store. Mr. Fitzpatrick testified a determination would need to be made whether or not the wheel stops were necessary, and a risk assessment would have to be done before they could be removed. He was the person that would have done that risk assessment in coordination with legal. He did not know if a bollard alone would suffice to meet code requirements in Crossville, Tennessee. It was his job to proactively discover problems that affect customer safety. He admitted the wheel stops were in place, not because they were required on a statutory basis, but because the company was requiring wheel stops to prevent vehicles from driving into the store.

Richard Sebastian is the Senior Director of Operations for all 56 Buc-ee's retail stores. He was deposed on December 18, 2025. He testified Dale Fitzpatrick was responsible for safety at the stores. He testified he had no knowledge whether wheel stops were required at the Crossville, Tennessee store where Ms. Carrell fell.

Brian Matthews, the maintenance manager at the Buc-ee's Store in Crossville, Tennessee, testified the purpose of the wheel stops was to keep cars off the building. Wes Harness, the general manager of the Buc-ee's Store in Crossville at the time of Ms. Carrell's fall, testified that the

28

bollards in the handicapped parking spaces were never damaged while he was the general manager. Wes Harness testified the decision to remove the wheel stop most likely would have been up to Dale Fitzpatrick.

The wheel stops performed no function. At the store in Crossville, Tennessee, the wheel stop was located approximately 7 ½ inches from the edge of the bollard. A vehicle would encounter the bollard before the tires would contact the wheel stop.



The bollards located in their existing position in the center of the parking stall was the only design element necessary for the Crossville Buc-ee's to be ADA compliant. Removing the wheel stops were a feasible alternative that would have totally eliminated customer injuries over wheel stops.

29

**Expert Opinion 3** – The subject wheel stops were a pedestrian hazard because Buc-ee's placed wheel stops in a "foreseeable pedestrian path".

ASTM Standard F1637-95, Section 8.2 states:

> 8.2. Wheel stops shall not be placed in a pedestrian walkways or foreseeable pedestrian paths.

Based on observation and experience, Buc-ee's had actual knowledge customers utilized parking spaces as a pedestrian path entering and leaving the store. The accessible parking spaces at the entrance/exit are a part of the "foreseeable pedestrian path" customers utilize to enter and exit the store.

Wes Harness, the manager, admitted that customers routinely walk through empty parking spots. There were no "walk here only signs" in any area. Mr. Harness said he would not say anything to a customer that walked through an empty parking spot. He admitted that he knew customers walked through empty parking spots. Brian Matthews, the maintenance manager, testified that he knew people walked through the handicapped parking spots when the spots were vacant. He testified that if the most direct route was to walk through a vacant handicapped parking spot, he would walk through the handicapped parking spot. He admitted that people were not required to stay within the cross-hatched area. There were no signs telling people to only walk in the cross-hatched area. He stated that he testified people were free to walk where they want. Timothy Laios, Assistant General Manager, testified that he knew that customers walked through empty handicapped parking spots and that there were no signs prohibiting walking there. Laura McConnell, Assistant General Manager, tripped and fell over a wheel stop in Crossville. She also tripped and fell over a wheel stop at Leeds, AL Buc-ee's. Videos from trip and falls in Crossville show customers walking through handicapped parking spots.

**Expert Opinion 4** – Before Crossville opened, Buc-ee's had knowledge wheel stops in the accessible parking spaces were trip and fall hazards because of reports of trip and falls over wheel stops occurring at other similar design travel centers.

Beginning in 2019 and prior to December 2, 2023, the following Buc-ee's Travel Centers opened outside the state of Texas.

30

Store #42 – Baldwin, AL (store opened January 21, 2019), approx. 53,000 sq. ft.
Store #43 – Leeds, AL (store opened January 25, 2021), approx. 53,000 sq. ft.
Store #45 – Sevierville, TN (store opened June 26, 2023), approx. 74,700 sq. ft.
Store #46 – St. Johns County, FL (store opened February 22, 2021), approx. 53,000 sq. ft.
Store #47 – Daytona Beach, FL (store opened March 22, 2021), approx. 53,000 sq. ft.
Store #51 – Warner Robins, GA (store opened November 18, 2020), approx. 53,000 sq. ft.
Store #52 – Calhoun, GA (store opened August 23, 2021), approx. 53,000 sq. ft.
Store #53 – Florence, SC (store opened May 16, 2022), approx. 53,000 sq. ft.
Store #55 – Richmond, KY (store opened April 19, 2022), approx. 53,000 sq. ft.
Store #57 – Athens, AL (store opened November 21, 2022), approx. 53,000 sq. ft.
Store #58 – Auburn, AL (store opened April 10, 2023), approx. 53,000 sq. ft.

These Travel Centers have the same arrangement of accessible parking spaces located at entrances and exits to the store, all have wheel stops in the same location in the accessible parking spaces, and all have accessible parking spaces sign holders in the same location and all have ramps that lead to the door entrances. The number of handicap parking spaces depends on the size of the Travel Centers. There are two (2) sizes of the stores, approximately 54,000 sq ft and 74,000 sq ft.

The testimony of Dale Fitzpatrick, Health and Safety Manager for all of Buc-ee's retail stores and offices, and Richard Sebastain, Senior Director of Operations for all retail stores nationwide, shows that beginning in 2019 with the opening of Store #42, Buc-ee's was aware customers were tripping and falling over the wheel stops in the accessible parking spaces at these stores.

Richard Sebastian testified he believed the first store to have red and white tape was Store #42 in Alabama. Store #42 opened January 21, 2019. This store was the first Travel Center outside the state of Texas. Floyd, the general manager there, addressed Buc-ee's legal department about adding red and white tape. After that, red and white tape was added to wheel stops on wheel stops in other located outside the state of Texas on a store-by-store basis.

Dale Fitzpatrick testified that the first store to put red and white tape on tire stops was Store #42 Baldwin, AL. The decision to add the red and white tape at Store #42 in Alabama was made before Dale Fitzpatrick was employed in 2020. He testified if a particular general manager noted an issue with wheel stops at their store, the guidance from legal was for them to put the red and white tape on the wheel stop in the handicapped section. Guidance was related to store managers on a case-by-case basis. To the best of his knowledge, legal was giving the store general managers the advice to put this tape on. Mr. Fitzpatrick testified that red and white tape was added when

31

there was a problem with customers tripping and falling over wheel stops. He testified every store that applied red and white tape applied the tape because there was an issue of customers tripping and falling over the wheel stops. If a store was noticing the trip and falls over wheel stops were occurring, the general manager would seek guidance from legal. The guidance from legal was to add red and white tape. He testified that every store that had red and white tape on the wheel stop would be a store that had had problems with people tripping and falling over wheel stops.

In response to Plaintiff's Requests for Production of Documents, Buc-ee's produced 196 Customer Personal Injury reports of trip and fall incidents over wheel stops in the accessible parking spaces at these ten (10) Buc-ee's Travel Centers, not including Crossville, between May 19, 2022 and December 2, 2023, the date of Ms. Carrell's fall.

The 196 Customer Personal Injury reports of falls at the Travel Centers outside the state of Texas provided by Buc-ee's for falls occurring between May 19, 2022 and December 2, 2023 are not all of the falls which occurred. JJ Justilian testified Customer Personal Injury reports between 2019 and May 19, 2022 at other similar stores were deleted due to Buc-ee's retention policies. Ms. Justilian had no idea how many Customer Personal Injury reports regarding trip and fall over wheel stops were submitted that were deleted subject to Buc-ee's retention policies. Richard Sebastian identified Customer Personal Injury reports from seven (7) trip and falls over wheel stops which occurred at the Calhoun, GA store which occurred between August 24, 2021 and January 10, 2022 as evidence that reports of Customer Personal Injury were made prior to May 2022.

**Expert Opinion 5 – Before Plaintiff fell, Buc-ee's had knowledge the wheel stops in the accessible parking spaces in Crossville were a trip and fall hazard.**

The first trip and fall on a wheel stop in Crossville happened the day the store opened. When the Crossville store opened, the wheel stops were solid blue. Wesley Harness, GM, testified the red and white tape was added to make the store safer for guests. Ashley McGeorge, Assistant General Manager, stated that local AGMs and GMs decided to add reflective red and white tape to make the store safer. Ms. McGeorge did not know when the reflective tape was added. She stated that based on customer statements, the management team knew customers were not seeing the tire stops. She admitted that putting the tape on the wheel stops did not stop the falls. She

32

admitted people kept falling. Based on the statements in the incident report, she testified she felt like it was pretty clear that a lot of people that fell said they did not see the wheel stops. Ashley McGeorge testified that as a percentage of the customer personal injury reports she wrote, trip and falls over the wheel stops constituted the largest single one object that she reported.

AGM Timothy Laios testified that as a percentage of the reports of injury that he had made from any one single object wheel stops constitute the majority of the reports. He could not recall one single object that caused so many injuries. He testified people continued to fall after tape was added.

Dale Fitzpatrick testified that he was aware red and white tape was added to the tire stops at Crossville, but didn't have specific knowledge of the exact date that was applied. He testified the reason the tape was applied to the store in Crossville was due to customer tripping falls over tire stops.

Placing the red and white tape on the wheel stops did not stop the falls. People continued to fall over the wheel stops. The local store general manager and assistant general managers had actual knowledge of the trip and fall hazard caused by the wheel stops and the accessible parking spaces. The Crossville Buc-ee's submitted 60 customer personal injury reports to the claims department before Lisa Carrell fell on December 2, 2023.

**Expert Opinion 6 – Buc-ee's attempt to make wheel stops more visible by adding red and white tape failed to correct the problem.**

ASTM F1637, Section 8.3 states as follows:

8.3. Wheel stops shall be in contrast with their surroundings.

When the Crossville store opened the wheel stops were solid blue, the same color as the surrounding accessible parking space outline. Customer Personal Injury reports consistently state customers did not see the wheel stop. Some customers that tripped and fell specifically commented they did not see the wheel stops because they were blue. As noted previously, the red and white tape was added to make the wheel stops more visible but customers continued to fall. Blue wheel stops are not typical and blend in visibly with the blue accessible parking lot markings. Even with red and white tape, the wheel stop blended into the blue markings which surrounded them. Yellow

33

or orange are warning colors. The red and white tape Buc-ee's added proved to be ineffective as shown by the large number of pedestrian falls that continued to occur after the tape was added.

Below are photos of the accessible parking spaces at the front of the Crossville store. These photographs show the wheel stops were the same color of blue as the accessible parking outlines and the painted bollard. The wheel stops would have been more visible if they were yellow.



34





Case 2:24-cv-00080    Document 94-1    Filed 05/29/26    Page 36 of 49 PageID #: 1190

**<u>Expert Opinion 7</u> – Despite the existence of a feasible alternative, the wheel stops at the Buc-ee's in Crossville and at other stores are still in place and are continuing to cause injuries.**

Between December 2, 2023 and October 20, 2025, there have been an additional 50 trip and falls over wheel stops at the Crossville store alone. Between December 2, 2023 and October 19, 2025, there have been 388 more Customer Personal Injury reports of trip and falls over wheel stops at the following stores.

Store #42 – Baldwin (Robertsdale), AL
Store #43 – Leeds, AL
Store #45 – Sevierville, TN
Store #46 – St. Johns County, FL
Store #47 – Daytona Beach, FL
Store #51 – Warner Robins, GA
Store #52 – Calhoun, GA
Store #55 – Richmond, KY
Store #56 – Smiths Grove, KY
Store #57 – Athens, AL
Store #58 – Auburn, AL
Store #60 – Johnstown, CO
Store #62 – Springfield, MO

As of December 17, 2025 and December 18, 2025 in the depositions of Richard Sebastian and Dale Fitzpatrick, both claimed not to know whether the wheel stops could be removed.

Richard Sebastian testified that the following stores have opened recently: Store #69, Rockingham, VA; Store #61, Harrison County, MS and Store #63 Brunswick, GA. Photographs from Google Maps of those stores' exterior, specifically the accessible parking spaces, show the same arrangement of accessible parking spaces location at the entrance/exits of the store, all without the use of wheel stops. There are blue bollards with accessible parking signs in the center of the accessible parking stalls. These stores show there is a feasible alternative to the use of wheel stops in Crossville.

37

## Store #61 – Harrison County, MS

8245 Firetower Rd.
Pass Christian, MS 39571





39

## Store #63 – Brunswick, GA
6900 Hwy 99
Brunswick, GA 31525





41



## Store #69 – Rockingham, VA
6500 Buc-ee's Blvd.
Mount Crawford, VA 22841







## Expert Opinion 8 – I have reviewed the Declaration of Donald D. Elswick, CIH, CSP, CIT, CHMM.

The declaration implies, but does not expressly state, that wheel stops were a required design element necessary to comply with applicable federal and state regulations. As stated in Opinion #1 earlier, the wheel stops located in the handicap parking spaces at Buc-ee's in Crossville were not required to meet applicable federal and state regulations.

ADA Standards regarding accessible design apply to all Buc-ee's stores. The three (3) new stores with bollard and without wheel stops are further proof of a feasible alternative design that meets ADA standards without use of wheel stops.

**Expert Opinion 9 – Buc-ee's Safety Policies are questionable, vague as to individual responsibilities and reporting procedures, and lack definition regarding the required communication of pedestrian falls up and down the chain of command. An emphasis on customer safety was lacking at the time of Ms. Lisa Carrell's fall.**

Ashley McGeorge identified Dale Fitzpatrick at corporate as the person responsible for safety at the Crossville store. She did a safety audit walk with Mr. Fitzpatrick on one occasion. She remembered he gave safety speeches that covered safety of employees. What he discussed about customer safety was more about filing out the incident reports properly. She never talked to him about customer personal injuries for trip and falls over the wheel stops.

Timothy Laios identified Dale Fitzpatrick as the person at corporate responsible for safety. When Dale Fitzpatrick came to the store. he came to review employee injuries. He could not recall any conversations with Dale Fitzpatrick about customer safety. He could not recall any conversation with Dale Fitzpatrick regarding a customer injury. Communications from Dale Fitzpatrick were regarding employee injuries.

Wesley Harness identified Dale Fitzpatrick as the designated risk manager at corporate. Dale Fitzpatrick visited and did generalized inspections at the store. When Dale Fitzpatrick visited the Crossville store, he never talked to Wesley Harness about customers tripping and falling over wheel stops. Wesley Harness did not know what Dale Fitzpatrick's duties were. Most of Dale Fitzpatrick's communications were about employee safety and work injuries. Wesley Harness did not know who at corporate was keeping up with the number of trip and falls over tire stops.

J.J. Justilian, the claims manager at corporate headquarters, thought customer safety was part of Dale Fitzpatrick's job, but she testified she doesn't know what Dale Fitzpatrick does. She testified no one at Buc-ee's that she knew of was counting the number of trip and falls over wheel stops.

Richard Sebastian, the senior director of operations for all retail stores, also identified Dale Fitzpatrick as responsible for safety at all the stores. Richard Sebastian testified he did not know

46

whether anyone had ever been tasked with investigating how to reduce the number of trip and falls on wheel stops at Buc-ee's stores.

Dale Fitzpatrick testified he had been the health and safety manager since 2020. He had been to Crossville three (3) or four (4) times. He never spoke to Crossville management about wheel stops or injuries at wheel stops. Employee injuries were the main focus of his visits. He had never received any reports of trip and falls of customers over the wheel stop. He had never talked to JJ Justilian or Richard Sebastian about customer trip and fall injuries over wheel stops. He didn't know the date he learned that customers were tripping and falling over wheel stops. He hasn't done a study to see if adding the red and white tape was effective in reducing the number of injuries.

The above opinion is further supported by earlier findings revealing:

- A lack of existing Corporate Safety Training was stated in various employee deposition testimonies.
- No Corporate wide Safety Plans and Policies were discovered in the materials I reviewed.
- Deposition statements support that Buc-ee's corporate view was that the safety of employees was far more important to Buc-ee's management than customer safety.

47

# APPENDIX A

## Federal and State Court – Depositions and Trials

| Date | Court | Docket No. | Deposition or Trial |
|------|-------|-----------|---------------------|
| 8-20-21 | Wayne County Circuit Court | No. 4294 and 4295 | Deposition |

*State of TN v. Harry V. Floyd, et al.* Attorney, Houston Gordon

| 8-25-21 | Claims Commission, State of TN | Unknown | Trial |

*West v. State of Tennessee (Middle Division)* Attorney, Henry Queener

| 2-24-22 | Sumner County Circuit Court | Unknown | Deposition |

*N.C. Hager v. Eddie Anderson, et al.* Attorney, John Griffith

| 6-27-22 | McNairy County Circuit Court | Unknown | Deposition |

*King & Duncan v. Town of Selmer, et al.* Attorney, John Burleson

| 8-29-22 | Davidson County Circuit Court | Unknown | Deposition |

*Budd v. Metro Nashville-Davidson Co.* Attorney, Ann Steiner

| 5-10-23 | Claims Commission, 13th Judicial Dist. | Unknown | Deposition |

*J. Clark & Estate of C. Walker v. State of Tennessee* Attorney, Chadwick Myers

| 7-19-23 | Wayne County Circuit Court | No. 4294 and 4295 | Trial |

*State of TN v. Harry V. Floyd, et al.* Attorney, Houston Gordon

| 10-18-23 | Superior Court of Banks County, GA | No. 22CV183 | Deposition |

*R. Dowell v. GA Dept. of Transportation* Attorney, Michael Ruppersburg

| 3-28-24 | Davidson County Circuit Court | Unknown | Deposition |

*T. Thompson v. SL Nashville, et al.* Attorney, Shannon Wiggins

| 10-8-24 | Williamson County Circuit Court | No. 2019-312 | Deposition |

*T. Hudspeth v. State of Tennessee, et al.* Attorney, Tom Dement

| 1-23-25 | USDC-Middle District of TN | No. 3:24-CV-00010 | Deposition |

*Patricia Staggs v. Panda Express, Inc.* Attorney, Michael Parsley

| 4-17-25 | Williamson County Circuit Court | No. 2019-312 | Trial |

*T. Hudspeth v. State of Tennessee, et al.* Attorney, Tom Dement

NOTE: Underlined party indicates whether Dr. Robert Stammer was a Plaintiff or Defense Expert Witness.